Filed 12/13/16 (unmodified opn. attached)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>YEVGENY SELIVANOV et al.,<br><br>    Defendants and Appellants. | B252894 consolidated with B255166<br><br>(Los Angeles County Super. Ct. No. BA372244)<br><br>ORDER MODIFYING OPINION AND DENYING REHEARING<br><br>[NO CHANGE IN JUDGMENT] |
| THE PEOPLE,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>YEVGENY SELIVANOV et al.,<br><br>    Defendants and Respondents. | B255166 |

THE COURT:

It is ordered that the opinion filed herein on November 17, 2016, be modified as follows:

1.      On page 12, in the third full paragraph, the fourth sentence beginning "Prosecution witnesses" the sentence is modified to read as follows:

Eairleywine and Smith testified that gifts for teachers and staff, and "activities for the pleasure of faculty and teachers and staff such as bowling," would not be permissible under any circumstances, and that "after hours dinners off campus" would "probably not" constitute proper expenditures of charter school funds.

2.	At the end of last paragraph on page 24 the last sentence that begins with "According to prosecution witnesses Eairleywine and Smith" and ends at the top of page 25 with "were authorized to make" add the word "generally" after Education.  So that the sentence now reads as follows:

According to prosecution witnesses Eairleywine and Smith, LAUSD and the Los Angeles County Office of Education generally did not classify "activities for the pleasure of faculty and teachers and staff such as bowling," and "after hours dinners off campus" as expenses that charter schools and their operators were authorized to make.

The petition for rehearing is denied.

| EPSTEIN, P.J., | MANELLA, J. | COLLINS, J. |

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>YEVGENY SELIVANOV et al.,<br><br>    Defendants and Appellants. | B252894 consolidated with<br>B255166<br><br>(Los Angeles County<br>Super. Ct. No. BA372244) |
| THE PEOPLE,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>YEVGENY SELIVANOV et al.,<br><br>    Defendants and Respondents. | B255166 |

APPEALS from judgments of the Superior Court of Los Angeles County, Stephen A. Marcus, Judge.  Affirmed as modified, with directions.

Kaplan Marino, Nina Marino and Allen G. Weinberg for Defendant, Appellant and Respondent Tatyana Berkovich.

Crowell & Moring, Jeffrey H. Rutherford and Nimrod Haim Aviad for Defendant, Appellant and Respondent Yevgeny Selivanov.

Young, Minney & Corr, Paul C. Minney, William J. Trinke and Kevin M. Troy; California Charter Schools Association, Ricardo J. Soto, Julie Ashby Umansky and

Phillipa L. Altman as Amicus Curiae on behalf of California Charter Schools Association in support of Defendants, Appellants and Respondents.

Jackie Lacey, District Attorney, Roberta Schwartz, Serena R. Murillo and Matthew Brown, Deputy District Attorneys for Plaintiff and Appellant The People of the State of California.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Michael C. Keller and Eric J. Kohm, Deputy Attorneys General, for Plaintiff and Respondent The People of the State of California.

_____

Spouses Yevgeny "Eugene" Selivanov and Tatyana Berkovich founded a charter school, Ivy Academia, in 2003.  In 2006, the Los Angeles Unified School District (LAUSD), which issued Ivy Academia's charter, conducted a random audit of the school's finances.  The audit revealed several irregularities, prompting a further investigation that ultimately resulted in the filing of a 33-count information charging Selivanov and Berkovich with numerous financial crimes.  After a five-week trial, a jury convicted Selivanov and Berkovich of felony embezzlement (Pen. Code, § 504)[1] and felony misappropriation of public moneys (§ 424, subd. (a)).  The jury further convicted Selivanov of felony false accounting of public moneys (§ 424,  subd. (a), money laundering (§ 186.10) and filing false tax returns (Rev. & Tax. Code, § 19705, subd. (a)).  In addition, as to Selivanov, the jury found true the allegation that the total losses associated with six of the embezzlement counts exceeded $65,000.  (§ 12022.6, subd. (a)(1).)

Selivanov and Berkovich each moved for a new trial.  The trial court granted the motions as to all of their convictions for misappropriation and false accounting of public moneys under section 424, subdivision (a), on the ground that it improperly had instructed the jury that the funds involved were public moneys.  The court sentenced

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

2

Selivanov to a total of four years, eight months in state prison, and sentenced Berkovich to formal probation on the condition that she serve 45 days in county jail. Both defendants were ordered to pay fines, fees, and restitution.

Selivanov and Berkovich appeal. They jointly challenge one of their embezzlement convictions on several grounds, including sufficiency of the evidence and the trial court's failure to give a unanimity instruction. They also seek reversal based on the court's failure to instruct the jury to determine whether the amount embezzled exceeded $950, and whether the embezzled funds were public funds within the meaning of section 514. Both defendants also contend the court erred by failing to consider proffered juror declarations when setting their restitution. Selivanov separately challenges the sufficiency of the evidence underlying his other convictions. He also challenges the court's failure to instruct the jury on the claim-of-right defense, the admission of certain accounting documents, and several aspects of the restitution order.

As we explain more fully below, we conclude the trial court erred in making the public funds finding but affirm defendants' convictions because the error was harmless. We do, however, direct the trial court to strike from Selivanov's restitution order the joint and several obligation to pay $22,396.60 in restitution to Ivy Academia in connection with his embezzlement conviction in count 2, and strike from Berkovich's restitution order any language making Selivanov jointly and severally liable for it. As modified, the judgments of the trial court are otherwise affirmed in full.

The Los Angeles County District Attorney ("the People") filed a cross-appeal challenging the trial court's grant of defendants' motions for new trial of the section 424 counts. In their opening brief, the People contend the trial court relied on outdated case law to conclude that the jury was required to determine whether a charter school is a district; they do not challenge the validity of the actual basis for the court's ruling, its jury instruction on "public moneys." In their reply, however, the People argue that the trial court's actual basis for granting the motion was erroneous. They urge us to excuse their oversight, reverse the trial court's rulings on the motions for new trial, and reinstate the guilty verdicts on all of the section 424, subdivision (a) counts affected by the motions.

We decline their invitation to do so and affirm the trial court's order granting defendants' new trial motions.

## PROCEDURAL HISTORY

On May 4, 2011, the People filed a 33-count information charging defendants with various financial crimes.[2]  Counts 1, 3, 5, 7, and 39 charged both defendants with misappropriating public moneys.  (§ 424, subd. (a).)  Each of those misappropriation counts was paired with a charge of embezzlement in excess of $950. (§ 504, counts 2, 4, 6, 8, and 40, respectively.)  The information also charged both defendants with filing false personal income tax returns in violation of Revenue and Taxation Code section 19705, subdivision (a) (counts 27-31).

Selivanov alone was charged with five additional counts of misappropriating and falsely accounting for public moneys. (§ 424, subd. (a), counts 9, 11, 18, 21, and 24.)  Four of those counts (9, 18, 21, and 24) were paired with a count of embezzlement in excess of $950 stemming from the same conduct.  (§ 504, counts 10, 19, 22, and 25, respectively.)  Three of those misappropriation-embezzlement count pairs—18-19, 21-22, and 24-25— were further supplemented with a related count of money laundering (§ 186.10, subd. (a), counts 20, 23, and 26.)  The information also alleged that Selivanov alone filed false business income tax returns.  (Rev. & Tax. Code, § 19705, subd. (a), counts 32-36.)  Berkovich alone was charged with one count of conflict of interest.  (Gov. Code, §§ 87100 and 91000, count 38).

The information further alleged, with respect to the misappropriation, embezzlement, and money laundering charges in counts 1-8, 18-26, and 39-40, that defendants took, damaged, and destroyed property of a value exceeding $65,000 within the meaning of section 12022.6, subdivision (a)(1).  With respect to most of the embezzlement counts, including all of those sounding against Berkovich, namely counts

---

[2] Following the parties' practice, we refer to the counts by the numbers used in the information and not the renumbered counts used at trial.  The original criminal complaint against defendants had 40 counts, which is why some of the counts discussed herein have a number higher than 33.

2, 4, 6, 8, 10, 19, and 40, the information alleged that the funds embezzled were "public funds" within the meaning of section 514.

Embezzlement and misappropriation counts 3-6 and 9-10 were dismissed pursuant to defendants' section 995 motions following the preliminary hearing. The court later dismissed the conflict of interest charge against Berkovich (count 38) pursuant to the People's motion under section 1385. Defendants pleaded not guilty to the remaining charges and denied all of the special allegations.

Defendants were tried jointly before a jury in February and March 2013. On April 5, 2013, the jury found Selivanov guilty of seven counts of misappropriating or falsely accounting for public moneys (counts 1, 7, 11, 18, 21, 24, and 39), six counts of embezzling in excess of $950 (counts 2, 8, 19, 22, 25, and 40), two counts of money laundering (counts 23 and 26), and 10 counts of filing false tax returns (counts 27-36). The jury acquitted Selivanov of a third money laundering charge (count 20) but found true the special allegation that, as to counts 2, 8, 19, 22, 25, and 40, Selivanov in the aggregate took money exceeding $65,000 within the meaning of section 12022.6, subdivision (a)(1).

The jury found Berkovich guilty of two counts of misappropriating public moneys (counts 1 and 39), one count of embezzling in excess of $950 (count 2), and five misdemeanor tax counts that were lesser included offenses of the charged felony tax violations (counts 27-31). The jury acquitted Berkovich of one additional count of misappropriation (count 7) and two additional counts of embezzlement in excess of $950 (counts 8 and 40). It also found not true the special allegation that she embezzled in excess of $65,000 within the meaning of section 12022.6, subdivision (a)(1). The court later dismissed Berkovich's misdemeanor tax convictions at the People's request, pursuant to section 1382.

Selivanov and Berkovich each moved for a new trial. The court granted the motions as to the misappropriation and false accounting counts charged under section 424, subdivision (a) (counts 1, 7, 11, 18, 21, 24, and 39) and denied the motions in all other respects.

5

At sentencing, at the People's request and over defendants' objections, the court found that "this case involved public funds" within the meaning of section 514, the statute setting out the punishment scheme for embezzlement offenses. The court later denied defendants' motions to strike the finding.

The court sentenced Selivanov to a total of four years, eight months in state prison, calculated as the high term of three years on one of the embezzlement counts (§ 504, count 8); an additional year for the enhancement on that count (§ 12022.6, subd. (a)); and eight months, one-third the midterm, on one of the money laundering counts (§ 186.10, subd. (a), count 26). The court imposed concurrent terms on all other counts of conviction. After a contested restitution hearing, the court ordered Selivanov to pay a total of $271,795.11 in restitution. Of that amount, $227,896.11 was payable to Ivy Academia: $126,654.73 was assessed in connection with count 40; $66,795.96 was assessed in connection with counts 8, 19, 22, and 25; and a total of $34,445.42 was assessed in connection with count 2. The remaining $43,899 of Selivanov's restitution was payable to the Franchise Tax Board in connection with the tax convictions in counts 27-36. The court also ordered Selivanov to pay a restitution fine of $5,000 and imposed and suspended a $5,000 parole revocation restitution fine.

The court sentenced Berkovich to five years' formal probation, on the condition that she serve the first 45 days in county jail. The court also ordered her to perform 320 hours of community service. The court found Berkovich jointly and severally liable with Selivanov for $22,396.60 in restitution in connection with her sole conviction for embezzlement (count 2). The court ordered Berkovich to pay a $1,000 restitution fine.

Both defendants timely appealed. The People also timely appealed the court's grant of defendants' new trial motions. The appeals were consolidated for oral argument and decision.

## FACTUAL BACKGROUND

This case concerns obfuscatory and complex financial transactions and accounting procedures. In the interest of clarity and brevity, we recite immediately below the facts underlying the charged conduct, organized topically. Additional facts pertinent to the

6

legal issues raised on appeal will be discussed as necessary in connection with those issues.

## I. Ivy Academia

This case centers on defendants' conduct in their capacities as the founders and operators of a charter school, Ivy Academia. Charter schools are "public schools funded with public money but run by private individuals or entities rather than traditional public school districts." (*Today's Fresh Start, Inc. v. Los Angeles County Office of Education* (2013) 57 Cal.4th 197, 205.) Though operated independently, charter schools are subject to public oversight. (*Id.* at p. 206.)

Selivanov was the executive director of Ivy Academia. Berkovich initially served as the school's principal and later became its president. Both defendants continuously served on Ivy Academia's governing board of directors.

### A. Founding and Corporate Organization

In October 2003, defendants filed a petition to establish Ivy Academia with the Charter School Division of the Los Angeles Unified School District (LAUSD), which oversees charter schools. LAUSD approved the petition, authorizing Ivy Academia to begin operations the next fiscal year, July 1, 2004 through June 30, 2005. After the charter was approved, Selivanov incorporated Alternative Schools, Inc., a nonprofit public benefit corporation, to operate and do business as Ivy Academia. Selivanov also filed a fictitious business name statement identifying Ivy Academia as a fictitious name of Alternative Schools, Inc.

Defendants also owned another business entity, Academy Just for Kids, LLC ("AJFK"). Selivanov changed the name of that business to EGeneration, LLC in April 2005.

### B. Funding and Finances

#### 1. Charter School Funding Generally

According to prosecution witness Aaron Eairleywine, the central business advisor for LAUSD's Charter School Division, Ivy Academia was considered a public school entitled to receive state funds and federal funds that flow through the state. Eairleywine

and Patricia Smith, a representative of the Los Angeles County Office of Education's finance department, testified that the allocations from the state are "designed to fund the educational activities," "instructional program," and general operation of charter schools. Funding is based on charter schools' average daily attendance and is distributed primarily in the form of categorical and general purpose block grants. According to Eairleywine and Smith, categorical and general purpose block grants are considered unrestricted funds that may be spent "for the overall operation of the agency and its purpose" – i.e., for school or educational purposes. Eairleywine and Smith further testified that charter schools also receive restricted grants and other funds that must be spent for particular purposes, such as purchasing supplies, reducing class sizes, or paying for standardized testing. They both noted that LAUSD does not train charter school operators on the proper use of categorical or general purpose block grant funds.

According to Eairleywine, money usually does not begin flowing from the state to a new charter school until after the school begins operating. But new charter schools need funds at their inception to secure facilities, pay staff, and prepare the school for students. For that reason, Eairleywine explained, LAUSD requires charter schools to demonstrate access to funding in their initial petitions. Some charter schools obtain these initial funds through grants or philanthropic gifts. Others, like Ivy Academia, use loans.

### 2. The Start-Up Loan

Ivy Academia obtained a $250,000 loan from the California Department of Education. Ivy Academia also obtained a loan from Selivanov and Berkovich, referred to at trial as the "start-up loan." Ivy Academia's governing board approved the start-up loan in August 2004. It documented receipt of the start-up loan by issuing a three-year, unsecured promissory note payable to Selivanov in the amount of $250,000, plus nine percent interest.

Despite the personal nature of the loan and language in the promissory note making it payable to Selivanov personally, the start-up loan was booked in the "Due to Academy" account in Ivy Academia's QuickBooks accounting software. "Academy" referred to defendants' business entity AJFK, Academy Just for Kids. The Due to

8

Academy account was one of three QuickBooks accounts recording amounts owed to Selivanov, Berkovich, and their business entities. The other two, Due to Management and Due to EGeneration, will be addressed below.

The amount initially entered in the Due to Academy account on September 30, 2004 was approximately $397,000, though both the promissory note approved by the board and the audited financial statements Ivy Academia submitted to LAUSD reflected a loan of only $250,000. A few weeks later, on October 19, 2004, Ivy Academia made a $300,000 payment to AJFK, reducing the amount owed in the Due to Academy account to approximately $97,000. However, this payment appeared on Ivy Academia's audited financial statements as a payment of only approximately $74,000. The only people with access to Ivy Academia's QuickBooks accounting software were Selivanov and the school's bookkeeper, Marina Pilyavskaya. Pilyavskaya, who testified under a grant of immunity, testified that she did not do the books for defendants' other business entities.

The People charged Selivanov with falsifying the accounting of public moneys in connection with the discrepancies in the documentation of the start-up loan and its repayment (§ 424, subd. (a); count 11)).

### 3. Deferred Salaries

During the first year of Ivy Academia's operation, the school did not have funds available to pay salaries to Selivanov and Berkovich. Ivy Academia's governing board voted to defer payment of the salaries, plus nine percent interest, until the school's finances improved. Pilyavskaya entered the deferred salaries owed—$100,000 to Selivanov and $80,000 to Berkovich—into another QuickBooks account, "Due to Management." The amount owing in the Due to Management account increased to $230,000 after the board approved bonuses for both Selivanov and Berkovich. Ivy Academia regularly made payments to defendants to offset the interest accruing on the Due to Management account, but did not make formal salary payments against this account until April 2008, when it issued Selivanov a check for $18,000. The Due to Management account reflected two additional salary payments to defendants in 2008 (another $18,000 to Selivanov and $10,000 to Berkovich) and two to each defendant in

9

2009. Each defendant received a check for $11,000 in April 2009, and the Due to Management account reflected that. The other salary payment each defendant received in 2009—a check for $7,000—was documented in the Due to Management account as a payment of only $1,727.80. No further salary payments were documented in the Due to Management account until early 2011, after the board voted to pay down the salary still owed to defendants in regular increments. The balance of the Due to Management account reached zero in July 2011.

### 4.        Financial Oversight

Like other charter schools authorized by LAUSD, Ivy Academia was subject to examination and audits by the LAUSD Charter School Division. Eairleywine testified that charter schools are required to submit preliminary budgets, interim reports, and annual audits to the Charter School Division in addition to undergoing on-site reviews. Charter schools also are required to hire independent auditors, selected from a list approved by the state controller's office, to prepare annual audited financial statements. Although it complied with these requirements, Ivy Academia was the subject of a random audit in 2006. That audit led to a lengthy investigation that resulted in the criminal charges at issue here. While the investigation was ongoing, in 2008, LAUSD approved Ivy Academia's petition to renew its charter.

## II.     American Express Charges and Expenditure of Public Funds

Selivanov and Berkovich each had an Ivy Academia American Express credit card. The People alleged that defendants' use of their American Express cards constituted misappropriation of public moneys (§ 424, subd. (a); count 1) and embezzlement of public funds (§§ 504, 514; count 2).

Pilyavskaya testified that she was responsible for processing the defendants' charges. When she received the monthly American Express bill, she would prepare expense reports and request receipts supporting defendants' purchases. Pilyavskaya attached the receipts to the expense reports and gave them to board member Arthur

10

Sarkisian for approval.[3] Sarkisian approved the expense reports and then returned the reports and accompanying receipts to Pilyavskaya, who kept them in her office.

During LAUSD's investigation of Ivy Academia, LAUSD financial analyst and forensic accountant Connie Delos Santos[4] reviewed Pilyavskaya's American Express records. Delos Santos prepared a spreadsheet showing all charges made to the Ivy Academia American Express account from January 2005 through January 2010. She highlighted each charge she deemed "questionable" or "disallowed" based on her online research into public school spending, her general understanding of the types of purchases that have school purposes versus those that are "personal in nature," and a LAUSD meal policy. The charges Delos Santos deemed "questionable" totaled $34,445.42.

According to Delos Santos, the "questionable" charges made on Selivanov's American Express card totaled $12,048.82. These charges included $48.71 for flowers purchased on Valentine's Day and booked into the "Office Supply" account in Ivy Academia's QuickBooks; $59.94 for a business meeting at Crazy Tokyo on a Friday night at 9:48 p.m., booked as utilities and housekeeping; and $135.89 at Cheesecake Factory on a Saturday afternoon for a business meeting. The "questionable" charges on Berkovich's American Express card totaled $22,396.60. They included $67.38 for two "Welcome Baby" floral arrangements, booked as other office supplies; two $42.45 floral arrangements for councilman Jack Weiss, booked as teacher appreciation; $631.38 at Things Remembered, booked as maintenance supplies; $100 for a Crate and Barrel gift card, also booked as maintenance supplies; $995 for a "Tax secrets seminar by Patrick James," booked as other professional development; and various items purchased at Costco, including a Speedo bathing suit, shrimp scampi, and Pull-Ups training pants. Both defendants also repeatedly charged hundreds of dollars at bowling alleys and

---

[3] At trial, Sarkisian and two other members of the board, Alex Kauffman and Marci Adams, each invoked the Fifth Amendment right against self-incrimination. Kauffman previously had testified at the preliminary hearing, however, and that testimony was read into the record at trial.

[4] The Deputy District Attorney confirmed this spelling of Delos Santos's name at oral argument.

11

restaurants for "teacher appreciation" events, at least one of which included the purchase of alcohol.

Defendants did not reimburse Ivy Academia for any of these charges, though Pilyavskaya testified that Berkovich sometimes wrote "no" or "mine" on receipts to indicate items that were not purchased for the school. Defendants did not reduce the amount owed to them in the Due to Management account by documenting their "questionable" purchases there, and they did not report the purchases as income on their personal income taxes. According to former Ivy Academia principal Christina Desiderio, however, Berkovich boasted that her Ivy Academia credit card was "unlimited" and stated that she wanted to open more charter schools because "it could make you a millionaire."

The independent auditors who prepared financial statements for Ivy Academia included a note in their 2006 report that "there was a problem with the credit card use," including inadequate explanations for charges, and expenditures that "appeared to be personal in nature." Prosecution witness Michael Atkinson, a senior investigator with LAUSD's Office of the Inspector General, testified that the audit paperwork included a notation that "Selivanov had fought with them about having that information removed from the audit report" and another reminding the auditors to "closely review their use of credit cards to see if these deficiencies have been corrected."

Both the prosecution and the defense presented witnesses who testified about the standards governing spending by charter schools. All of the witnesses generally agreed that public moneys or funds received by charter schools must be spent on educational or school purposes. The witnesses differed, however, on whether or under what conditions certain expenditures met that standard. Prosecution witnesses Eairleywine and Smith testified that gifts for teachers and staff, "activities for the pleasure of faculty and teachers and staff such as bowling," and "after hours dinners off campus" would not be permissible under any circumstances. Defense witnesses Caprice Young, founder of the

12

California Charter Schools Association[5]; Eric Premack, executive director of the Charter Schools Development Center; and Roger Lowenstein, the founder and director of a charter school; all testified that such expenditures could be appropriate. Premack added that a charter school would need to have "reason to believe that it helps the school achieve its instructional goals," and Lowenstein agreed that charter schools have a duty to guard public funds.

## III.    Rent Increase

In June 2004, defendants' other business entity, AJFK, entered into a 10-year sublease agreement with J & N Amoroso Family Investments, LLC for a property to use as Ivy Academia's campus. Under the sublease, which Selivanov and Berkovich personally guaranteed, AJFK agreed to pay rent of $18,390 per month for a 24,520-square-foot building on De Soto Avenue in Woodland Hills. The rent was adjustable, but increases were pegged to the Consumer Price Index and capped at five percent per year.

Without the knowledge of landlord J & N Amoroso Family Investments, AJFK assigned the sublease to Alternative Schools, Inc. (Ivy Academia) on September 1, 2004, for a period of two years. Ivy Academia moved into the De Soto Avenue building shortly thereafter. Under the terms of the sublease assignment, Ivy Academia became jointly and severally liable for AJFK's obligations under the sublease, including the monthly rent of $18,390 per month.

On October 2, 2008, more than two years after the original sublease assignment expired, Selivanov presented the Ivy Academia board with a proposal to approve another assignment and assumption of the sublease. The new "Assignment Assumption of Lease" would be "made as of July 1st, 2007 by and between Academy Just For Kids (EGeneration LLC) . . . and Alternative Schools Inc. . . . for a period of seven years." Under the terms of Selivanov's proposed Assignment Assumption of Lease, Alternative Schools, Inc. (Ivy Academia) would agree "to make a monthly payment to [AJFK/EGeneration], or its designee, in the amount of $43,870.05 for the use of the

---

[5] The California Charter Schools Association filed an *amicus curiae* brief supporting defendants on appeal.

facility and lease guarantees."[6] The monthly rent was scheduled to increase five percent each year on July 1. Selivanov presented to the board a "Broker Opinion of Value" prepared by real estate brokerage firm Lee & Associates. That opinion stated that the reasonable fair market value of monthly rent for the approximately 27,000-square-foot building "in its current condition and existing use" as of October 28, 2007 was approximately $1.75 per square foot, triple net, or $47,250.

Defendants recused themselves from voting on the Assignment Assumption of Lease. The remaining two board members who were present decided the substantial rent increase it contained "was an appropriate risk that the school was taking" and approved the Assignment Assumption of Lease. However, one of them, Alex Kauffman, testified at the preliminary hearing that he never reviewed the original sublease. Selivanov signed the undated Assignment Assumption of Lease on behalf of AJFK/EGeneration, and board treasurer Arthur Sarkisian—who had been absent from the meeting at which the proposal was presented and approved—signed on behalf of Ivy Academia.

According to Kauffman's preliminary hearing testimony as read at trial, the board discussed "the fact that Ivy's monthly payment is only 90% of the fair market value of the facilities as determined by Lee & Associates and the school has just rented [a] new high school facility at $1.75 per square foot in tremendous competition with another

---

[6] The full text of the pertinent paragraph provided: "Assigner [AJFK/EGeneration] was the original Sublessee under the Sublease. Assigner assigned the Sublease to Assignee [Alternative Schools, Inc.] for period [sic] of seven years. Assignee desires to accept the assignment of the Sublease. Both Assigner and Assignee agree as follows: (a) each of them hereby ratifies all the terms and conditions of the Sublease, (b) each of them is, and shall hereafter forever remain, jointly and severally liable for all Sublessee's obligations under the Sublease, (c) to the extent necessary Assigner approves the assignment of the Sublease to Assignee, and Assignee accepts such assignment for period [sic] of seven years, (d) Assignee agrees to sell Assigner $520,000 of tenant improvements, in return Assignor [sic] agrees to assume $520,000 of Assignee's bank loan from Western Commercial bank [sic], and (e) Assignee agrees to make a monthly payment to the Assigner, or its designee, in the amount of $43,870.05 for the use of the facility and lease guarantees; this payment will increase 5% every July 1st[.]"

charter school."[7] Kauffman further testified that the board also viewed the rent increase as the fair market value of the "constant risk" defendants assumed when they obtained a loan from Western Commercial Bank to improve the premises. (See IV. Western Commercial Bank Loan, *post* at pp. 16-18.)

LAUSD investigator Michael Atkinson testified that the effect of the board's approval of the Assignment and Assumption of Lease was an increase in the monthly "rent that Ivy Academia has to pay from [$]18,390 per month to $43,870.05 per month," an increase of approximately $25,480 per month, or nearly 139 percent. The total net amount of increased rent owed from the agreement's effective date of July 1, 2007 through June 2, 2008 was approximately $237,000. This amount—$237,000— was entered into Ivy Academia's Due to EGeneration QuickBooks account as a liability to EGeneration on June 30, 2008, roughly three months before the board was apprised of and approved the Assignment and Assumption of Lease on October 2, 2008.

Jason Amoroso, a real estate attorney involved with the original sublease between J & N Amoroso Family Investments and AJFK, testified that the fair market value of the De Soto Avenue property was that originally agreed upon: $18,390 per month, increasing each year in step with inflation. He also testified that he was not aware that AJFK ever assigned the lease to Ivy Academia. QuickBooks printouts introduced by defendants showed that Ivy Academia continued to pay J & N Amoroso Family Investments the originally agreed upon rent even after the increase was approved by the board and booked into Ivy Academia's QuickBooks. Amoroso, however, testified that "we received checks from Ivy Academia[,] EGeneration, various entities . . . and they stated they were involved with the school."

Prosecution witness James Balbin, a certified public accountant, opined that the rent increase was a "sham transaction" that was "just absurd." He further testified that there was "no business purpose to increase the lease payment due on this rent." Defense

---

[7] The increased monthly rent of $43,870.05 approved by the board was approximately 93 percent of the fair market value stated in the Lee & Associates opinion.

expert Jan Goren, a certified public accountant, countered that the rent increase reflected various business risks: the risk that defendants would need to satisfy their guarantee on the original sublease, the risk that they would have to remove various leasehold improvements from the premises, and the risk that Ivy Academia could lose its charter.

Selivanov presented testimony from Robert Gutzman, a real estate appraiser. Gutzman conducted a historical appraisal of the property, which he determined to be 27,854 square feet. Gutzman testified that the property was worth $1.66 per square foot, or $46,125 per month, as of July 1, 2007 and $1.70 per square foot, or $47,250 per month as of October 1, 2008.

The People alleged that certain payments made to EGeneration after the rent increase constituted both misappropriation of public funds (§ 424, subd. (a); count 7) and embezzlement of public funds (§§ 504, 514; count 8).

## IV. Western Commercial Bank Loan

In June 2006, Alternative Schools, Inc. (Ivy Academia) obtained a five-year, $500,000 loan from Western Commercial Bank to finance "phase two remodeling" of the De Soto Avenue premises from a warehouse into a school. In August 2006, the loan amount was increased to $600,000.

In March 2009, when the outstanding balance of the loan stood at $390,000, Selivanov asked Western Commercial Bank to change the borrowing entity on the loan from Alternative Schools, Inc. to EGeneration, LLC. According to former Western Commercial Bank underwriter Jennifer Irrizary, Selivanov made the request because he needed some additional write-offs. The bank effectuated the change on March 20, 2009. Both defendants signed in their capacity as managers of EGeneration, and Selivanov personally guaranteed the loan.

Just as the rent increase was documented in the Ivy Academia's QuickBooks months before it was presented to and approved by the board, changes to the loan were entered into Ivy Academia's QuickBooks long before Western Commercial Bank formally transferred the loan to EGeneration. According to prosecution witnesses Atkinson, Delos Santos, and Balbin, Ivy Academia's QuickBooks documented an "asset

16

sale" on July 1, 2007, when the loan had an outstanding balance of $520,000. According to those witnesses, the asset sale consisted of EGeneration's assumption of responsibility for the $520,000 loan balance in exchange for Ivy Academia's transfer of $520,000 worth of improvements on the De Soto Avenue property to EGeneration. The property improvements were not physically transferred to EGeneration, because Ivy Academia was using them on its campus. However, the property improvement assets were removed from Ivy Academia's balance sheet and transferred to EGeneration's along with the loan liability. Delos Santos and Franchise Tax Board special agent Rigoberto Salazar both testified that EGeneration claimed a depreciation deduction for the assets on its 2007 Limited Liability Company Return of Income taxation form.

The asset sale transaction was presented to and approved by the Ivy Academia board on October 2, 2008, concurrently with the rent increase. The board minutes, which the parties stipulated were admissible as business records, state that the board "noticed that the sale of assets is beneficial to Ivy as it allows the school to strengthen its balance sheet, while EGeneration LLC will only be able to recognize about 30c on $1 benefit from this purchase through the depreciation of assets." The board accordingly approved the transaction, which was documented in the same Assignment Assumption of Lease that effectuated the rent increase. As noted above (*ante,* fn. 6), a single sentence in the one-page Assignment Assumption of Lease contained both provisions. That sentence stated that Ivy Academia "agrees to sell to [EGeneration] $520,000 of tenant improvements, in return [EGeneration] agrees to assume $520,000 of [Ivy Academia's] bank loan from Western Commercial bank, and . . . [Ivy Academia] agrees to make a monthly payment to [EGeneration], or its designee, in the amount of $43,870.05 for the use of the facility and lease guarantees; this payment will increase 5% every July 1st."

After liability for the loan was transferred from Ivy Academia to EGeneration, Ivy Academia continued to make loan payments directly to Western Commercial Bank. According to Delos Santos and Pilyavskaya, these payments—totaling $126,654.73— were recorded in Ivy Academia's QuickBooks as rent payments. Pilyavskaya agreed on cross-examination that payments on the loan were recorded as rent payments "as of at

17

least August 16th of 2008," predating both board approval of the asset sale transaction (October 2, 2008) and the formal transfer of the loan to EGeneration (March 2, 2009), but post-dating the putative effective date of the asset sale transaction (July 1, 2007).

After the rent increase, Ivy Academia owed $43,870.05 in rent per month. That amount, less that month's payment to J & N Amoroso Family Investments and loan payment to Western Commercial Bank, was documented in the Due to EGeneration account each month as a liability Ivy Academia owed to EGeneration. According to defense expert Goren, this arrangement was a consequence of the "or its designee" clause in the Assignment Assumption of Lease the board approved on October 2, 2008: "[Ivy Academia] agrees to make a monthly payment to [EGeneration], *or its designee*, in the amount of $43,870.05 for the use of the facility and lease guarantees . . . ." Goren explained that, after the rent increase, Ivy Academia owed $43,870.05 in rent to EGeneration each month. However, EGeneration named J & N Amoroso Family Investments and Western Commercial Bank as its designees to which Ivy Academia should make monthly payments in partial satisfaction of the total increased rent. In other words, Ivy Academia would pay some portion of the $43,870.05 rent to J & N Amoroso Family Investments, and another portion to Western Commercial Bank, at EGeneration's behest. Any remaining amount owed beyond those two payments each month was booked as a liability in the Due to EGeneration account. There is no documentary evidence formalizing these designations.

The People alleged that the loan payments Ivy Academia made after transferring the loan to EGeneration constituted both misappropriation of public moneys (§ 424, subd. (a); count 39) and embezzlement of public funds (§§ 504, 514; count 40).

V.     **Transfers of Funds to EGeneration**

As noted above, Ivy Academia had three QuickBooks accounts recording amounts owed to Selivanov, Berkovich, and their business entities: Due to Management, Due to Academy, and Due to EGeneration. The latter two accounts, which documented debts to both the former (AJFK) and current (EGeneration) names of defendants' other business

18

entity, were consolidated in Ivy Academia's QuickBooks in June 2008. After that point, the Due to Academy account was zeroed out.

Because the Due to Academy and Due to EGeneration accounts were eventually consolidated, and because AJFK and EGeneration were the same entity, prosecution witnesses treated these two accounts as one for purposes of determining the balance Ivy Academia owed to AJFK/EGeneration and, ultimately, Selivanov and Berkovich, the owners of that entity. Even though the Due to Management account also reflected money owed to defendants (their deferred salaries), neither the Ivy Academia QuickBooks nor the prosecution combined the Due to Management account with the Due to Academy or Due to EGeneration accounts. Defense expert Jan Goren opined that all three accounts should have been considered together because the amounts owed to defendants' business entities ultimately were owed to defendants personally.

Prosecution witnesses Atkinson and Delos Santos testified that the combined balance of the Due to Academy and Due to EGeneration accounts reached zero on August 1, 2007, meaning that, at that point, Ivy Academia no longer owed money to AJFK and/or EGeneration. Ivy Academia subsequently made three large monetary transfers to EGeneration, however: $25,000 on August 1, 2007, $20,000 on November 19, 2007, and $20,000 on December 1, 2007. Shortly after the $25,000 transfer, EGeneration issued a $24,000 check to Selivanov, leaving EGeneration with a total of $1,540.65 in its bank account. Before the first $20,000 transfer in November 2007, EGeneration's bank account balance dipped to $46.80. Following that transfer, EGeneration wrote a $7,000 check to Selivanov. Atkinson testified that absent the $20,000 transfer from Ivy Academia, EGeneration would not have had enough money to make the $7,000 payment. EGeneration's bank account balance slipped to $3,386.53 before the final $20,000 transfer in December 2007; shortly after that payment was deposited into its bank account, EGeneration issued two checks totaling $15,300.

On April 1, 2008, the balance in the Due to EGeneration account was negative, meaning that EGeneration owed money to Ivy Academia. Ivy Academia nevertheless issued a $5,000 check to EGeneration that day.

19

The Due to EGeneration account balance was still negative on June 30, 2008. On that date, however, a liability of $237,000 was added to the account, turning its balance positive; now, the account showed that Ivy Academia owed $208,623 to EGeneration. The $237,000 liability was the total net amount of increased rent Ivy Academia owed from the effective date of the rent increase, July 1, 2007, through June 30, 2008. This additional liability was added to Ivy Academia's QuickBooks three months before the rent increase was presented to and approved by the board.

After the balance of the Due to EGeneration account was bolstered by the addition of the retroactive rent liability, Ivy issued a series of small checks to EGeneration. On September 24, 2008, Ivy Academia issued a $5,000 check to EGeneration. It subsequently issued three additional checks to EGeneration: a $5,000 check on October 1, 2008, a $3,000 check on December 20, 2008, and a $5,000 check on March 16, 2009.

While all of the aforementioned transfers to EGeneration were being made, the amount owed to defendants as reflected in the Due to Management account remained unchanged at approximately $230,000. Prosecution witnesses Atkinson, Delos Santos, and Balbin and defense witness Goren all agreed that the amount due to defendants as documented in the Due to Management account exceeded the total amounts Ivy Academia transferred to EGeneration in 2007 and 2008. The balance of the Due to Management account was not reduced when any of the transfers to EGeneration were made, however, or at any time prior to 2008 and 2009, when Ivy Academia made several deferred salary payments directly to both defendants. Defendants ultimately directly received the full $230,000 in deferred salaries that the Due to Management account indicated they were owed.

The People alleged that Selivanov embezzled public funds by making the series of $5,000 and $3,000 transfers to EGeneration after the rent increase was added to the Due to EGeneration account (§§ 504, 514; count 8). They further alleged that each of the three larger transfers in 2007 constituted misappropriation of public moneys (§424, subd. (a); counts 18, 21, 24), embezzlement of public funds (§§ 504, 514; counts 19, 22, 25), and money laundering (§ 186.10, subd. (a); counts 20, 23, 26).

20

## VI.    Taxes

Defendants were charged with filing false personal and corporate income tax returns for the years 2004 through 2008.  Prosecution witnesses Salazar and Delos Santos testified that defendants failed to report on their personal income tax returns the personal expenses they charged to their American Express cards from 2005 to 2008.  Salazar and defense witness Goren both testified that any American Express charges constituting embezzlement or personal expenses should have been reported as taxable income, but proper school expenditures were not required to be reported.  Delos Santos testified that defendants would have to report as personal income even those charges that did not benefit them personally, such as teacher appreciation dinners, because "they are in control of the credit card."  Salazar testified that defendants improperly reported $46,000 they received as payment of their deferred salaries on their 2008 EGeneration tax return rather than on their personal income tax return.  Salazar further testified that defendants' personal tax returns would be affected by improprieties on the corporate tax returns filed by AJFK/EGeneration, because "any income or losses would flow in to the individual return" since defendants were AJFK/EGeneration's only members.

Salazar testified that AJFK/EGeneration's tax returns for the years 2004 through 2008 contained numerous improprieties.  In 2004, he testified, expenses shown in AJFK's accounting books were both deducted on the AJFK tax return and recorded as amounts owing to AJFK in Ivy Academia's Due to Academy account.  Salazar opined the deductions taken by AJFK were improper because the expenses were double-booked.  He also testified that the 2004 AJFK return contained $30,697.35 of deductions for "rent expenses," even though the AJFK QuickBooks showed the amount claimed was spent on other items such as "Office Depot expense, Dominoes [sic] Pizza, car insurance, Coffee Bean items, [El] Pollo Loco."  According to Salazar, the 2004 AJFK tax return also overreported AJFK's income because it included the October 19, 2004 $300,000 loan repayment from Ivy Academia as income, even though loan repayments are not income.

According to Salazar, the 2005 EGeneration return deducted $11,930 worth of "supplies expenses," which Salazar testified consisted of "items like cheesecake, the car

21

insurance, Victoria [*sic*] Secret, you know, the pretzel charges, pediatric care, and restaurant." Salazar testified that the 2006, 2007, and 2008 returns contained similarly improper deductions for supplies. According to Salazar, the improperly deducted amounts in those years were, respectively, $11,461, $9,125, and $9,367. Salazar also testified that the 2007 EGeneration tax return failed to report as income $43,795.96 that Ivy Academia paid in excess of the amount it owed to EGeneration that year.

The People alleged that both Selivanov and Berkovich filed personal income tax returns that they did not believe to be true and correct as to every material matter in tax years 2004, 2005, 2006, 2007, and 2008 (Rev. & Tax. Code, § 19705, subd. (a); counts 27-31). They further alleged that Selivanov filed tax returns for AJFK/EGeneration that he did not believe to be true and correct as to every material matter in tax years 2004, 2005, 2006, 2007, and 2008 (Rev. & Tax. Code, § 19705, subd. (a); counts 32-36).

## DISCUSSION

### I. American Express Charges Embezzlement Conviction (Count 2)

Both defendants challenge the section 504 embezzlement convictions stemming from their use of Ivy Academia American Express cards (count 2). Jointly, they contend there was insufficient evidence to establish that their use of the cards was fraudulent. They further contend that the court erred by failing to give a unanimity instruction and by failing to require the jury to find the amount taken exceeded $950. They argue that the cumulative effect of these two instructional errors deprived them of a fair trial. Defendants finally contend the court erred by finding at sentencing that the case involved "public funds" within the meaning of section 514. We address these contentions in turn.

#### A. Sufficiency of the Evidence

"When a defendant challenges the sufficiency of the evidence, "'[t]he court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." [Citation.]' [Citations.] 'Substantial evidence includes circumstantial evidence and any reasonable inferences drawn from that evidence.

22

[Citation.]' [Citation.] We ""'presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.'" [Citation.]' [Citation.]" (*People v. Clark* (2011) 52 Cal.4th 856, 943.)

The jury found defendants' use of the Ivy Academia American Express cards constituted embezzlement within the meaning of section 504. That statute provides: "Every officer of this state, or of any county, city, city and county, or other municipal corporation or subdivision thereof, and every deputy, clerk, or servant of that officer, and every officer, director, trustee, clerk, servant, or agent of any association, society, or corporation (public or private), who fraudulently appropriates to any use or purpose not in the due and lawful execution of that person's trust, any property in his or her possession or under his or her control by virtue of that trust, or secretes it with a fraudulent intent to appropriate it to that use or purpose, is guilty of embezzlement." (§ 504.) As the language of the statute makes plain, "[t]he offense of embezzlement contemplates a principal's entrustment of property to an agent for certain purposes and the agent's breach of that trust by acting outside his authority in his use of the property." (*People v. Sisuphan* (2010) 181 Cal.App.4th 800, 813-814.) It further contemplates a relationship of trust and confidence between the perpetrator and the victim (*People v. Wooten* (1996) 44 Cal.App.4th 1834, 1845) and a breach of that trust and confidence by "conversion of trusted funds coupled with the intent to defraud" (*In re Basinger* (1988) 45 Cal.3d 1348, 1363).

Defendants contend there was insufficient evidence from which the jury could conclude they acted with fraudulent intent or acted outside of their authority when using the American Express cards. We disagree.

"'The intent essential to embezzlement is the intent to fraudulently appropriate the property to a use and purpose other than that for which it was entrusted, in other words, the intent to deprive the owner of his property . . . .'" (*People v. McClain* (1956) 140 Cal.App.2d 899, 900.) "It is well established that intent to defraud may be inferred from the circumstances surrounding the transaction in question." (*People v. Eddington* (1962) 201 Cal.App.2d 574, 579; 2 Witkin & Epstein, Cal. Crim. Law 4th (2012) Crimes

23

Against Property, § 35, pp. 59-60.) The circumstances surrounding the credit card transactions identified as "questionable" provided a sufficient basis from which the jury could infer defendants acted with fraudulent intent. The People presented evidence that defendants used their Ivy Academia credit cards at restaurants to purchase meals for "business meetings" that occurred late at night and on weekend afternoons, and that these purchases were recorded in Ivy Academia's accounting books in categories including "utilities and housekeeping," "school supplies," and "dues and subscriptions." They also presented evidence that defendants charged large sums at bowling alleys and restaurants for "teacher appreciation" events, and that such events were not proper "educational purposes" for which a charter school permissibly could spend money. Even though Pilyavskaya, not defendants, prepared the expense reports and QuickBooks entries documenting these charges, she reported to Selivanov, who also had access to the QuickBooks, and the reports she prepared bear defendants' signatures. Additionally, the People presented evidence that Berkovich boasted about her "unlimited" credit card and her aspirations of becoming a millionaire by opening more charter schools, and that Selivanov sought to have Ivy Academia's independent auditors remove negative comments about defendants' credit card usage from their 2006 report. The jury readily could conclude from all of this evidence that defendants acted with fraudulent intent when using the American Express cards.

The jury likewise reasonably could conclude defendants acted outside the scope of their authority as Ivy Academia's operators when making the challenged charges. Defendants assert (without citation to authority) that board member Sarkisian's review and approval of the expense reports constituted express authority for the challenged charges. Defendants further suggest that LAUSD's failure to inform them of its concerns about the credit card charges, and the People's failure to call Ivy Academia's auditors as witnesses at trial demonstrate defendants' authority to make the charges. We are not persuaded. The People adduced evidence that charter schools operate under the authority not only of their own charters and governing boards but also the broader umbrella of the LAUSD Charter School Division. According to prosecution witnesses Eairleywine and

24

Smith, LAUSD and the Los Angeles County Office of Education did not classify "activities for the pleasure of faculty and teachers and staff such as bowling," and "after hours dinners off campus" as expenses that charter schools and their operators were authorized to make. The jury was entitled to credit this substantial evidence and infer from it that defendants lacked the authority to use the credit cards as they did, whether the board signed off on the expenditures or not. The jury was not, as defendants suggest, required to draw the opposite inference from LAUSD's silence about its concerns or the People's failure to call Ivy Academia's auditors as witnesses.

### B. Unanimity Instruction

Defendants contend the trial court's failure to give a unanimity instruction on count 2 constituted prejudicial error. We review assertions of instructional error de novo. (*People v. Shaw* (2002) 97 Cal. App.4th 833, 838.) Whether the trial court should have given a "particular instruction in any particular case entails the resolution of a mixed question of law and fact," which is "predominantly legal." (*People v. Waidla* (2000) 22 Cal.4th 690, 733.) Accordingly, we examine the issue without deference. (*Ibid.*)

In a criminal case, a jury verdict must be unanimous. (*People v. Collins* (1976) 17 Cal.3d 687, 693; Cal. Const., art. I, § 16.) This means that each individual juror must agree the defendant committed a specific offense. (*People v. Russo* (2001) 25 Cal.4th 1124, 1132.) Thus, "when the evidence suggests more than one discrete crime, either the prosecution must elect among the crimes or the court must require the jury to agree on the same criminal act." (*Ibid.*) The court generally has a sua sponte duty to give a unanimity instruction where, as here, the prosecution did not elect among the criminal acts alleged. (*People v. Melhado* (1998) 60 Cal.App.4th 1529, 1534; *People v. Jennings* (2010) 50 Cal.4th 616, 679.) There are several exceptions to this rule, however. "For example, no unanimity instruction is required if the case falls within the continuous-course-of-conduct exception, which arises 'when the acts are so closely connected in time as to form part of one transaction' [citation], or 'when . . . the statute contemplates a continuous course of conduct or a series of acts over a period of time.' [Citation.] There also is no need for a unanimity instruction if the defendant offers the same defense or defenses to the various

25

acts constituting the charged crime. [Citation.]" (*People v. Jennings*, *supra*, 50 Cal.4th at p. 679.)

Defendants contend "the way the case was presented to the jury showed [a unanimity] instruction was appropriate and required." They further assert, without citation to the record, that they "never defended the case as if the transactions were part of a single course of conduct." We disagree.

From the outset of the trial, all parties characterized the American Express charges as a single, continuing course of conduct. The People told the jury in their opening statement that the credit card charges constituted "basically one series of incidents, one course of conduct," and that they would ask the jury to make "the determination" that the expenditures were for "personal purchases that did not benefit the school and were not for school purpose." Defendants similarly characterized the numerous charges monolithically in their opening statements. Thus, Selivanov told the jury the evidence would show "that he acted in good faith, in the best interest of the school," and that no one—not the board, the independent auditors, or LAUSD—ever informed him "those types of purchases were prohibited." Berkovich took a different tack, but it too was a unified one. She asserted that "Everything was a school purpose, and if mistakes were made, . . . [t]he evidence is going to show that, but that is not criminal."

Opening statements are not argument. But they do "'prepare the minds of the jury to follow the evidence and to more readily discern its materiality, force, and effect.'" (*People v. Harris* (1989) 47 Cal.3d 1047, 1080.) And here, defendants continued to urge the jury to find all of the credit card charges permissible under a single theory. Berkovich told the court at sidebar that her sole defense was "that everything Miss Berkovich bought had a school purpose. And if it didn't have a school purpose, it was a recognized mistake that was reimbursed and that is the defense." She told the jury the same thing during her closing argument, arguing that "all these expenses, teacher appreciation that the prosecution thinks should not happen, meals, community outreach, networking, they are all expenses that are common in the industry."

26

Selivanov likewise presented a single defense to all of the credit card charges during his closing. He argued that the sole issue was "whether or not Mr. Selivanov intended to defraud Ivy Academia with respect to purchasing things on the American Express card," and that "there is no evidence of an intent to defraud." Both defendants emphasized that all of the charges, not merely some subset of them, were reviewed and approved by other individuals and entities. In short, they offered essentially the same defense to all of the acts. (See *People v. Jennings*, *supra*, 50 Cal.4th at p. 679; *People v. Thompson* (1995) 36 Cal.App.4th 843, 851.)

Defendants claim that the People deviated from the single course-of-conduct theory during rebuttal argument, thereby rendering a unanimity instruction necessary. In support, they point to four comments, three of which suggested that defense witnesses with ties to the charter school movement were biased. We are not persuaded. An attorney is permitted "to remind the jurors that a paid witness may accordingly be biased and is also allowed to argue, from the evidence, that a witness's testimony is unbelievable, unsound, or even a patent 'lie.'" (*People v. Arias* (1996) 13 Cal.4th 92, 162.) In attempting to characterize defense witnesses as biased, the People were asking the jurors to reject their testimony, not presenting multiple arguments as to why the credit card charges constituted embezzlement.

Defendants similarly take out of context the fourth comment, a remark by the prosecutor that the $995 Tax Secrets seminar Berkovich purchased with the credit card was "an embezzlement in itself." The People made this statement as part of an apparent effort to distinguish between the section 424 misappropriation and section 504 embezzlement counts stemming from defendants' usage of the credit cards. The People informed the jury that "the embezzlement charge does carry a minimum of $950. So, as such, one would have to find that the theft was $950 or more. Which, in this case, we the People would submit it is heavily substantiated just in terms of the charges. Now, in terms of a misappropriation of funds, there is no minimum limit on that. There is no $950 minimum, but we would submit, ladies and gentlemen, in terms of this case here that even the Tax Secret, even the Tax Secret item that was bought for $950 [*sic*], that is

27

an embezzlement in itself." These comments do not undermine the People's general approach to the charges, nor do they persuade us a unanimity instruction was necessary.[8]

## C. Value of Embezzled Property

Defendants contend their convictions for felony embezzlement in count 2 must be reversed or reduced to misdemeanors because the jury failed to specify a loss greater than $950 on the verdict forms. Defendants argue that because the verdict form simply stated that the embezzlement was a felony, it "created a de facto directed verdict on an element of the offense in violation of [their] equal protection and due process rights." This error, they contend, lessened the People's burden of proof and therefore requires reversal. In the alternative, they contend that the jury's failure to find that the embezzlement in count 2 was grand or petty theft, or to determine that the value of the property embezzled exceeded $950, requires that their convictions be deemed to be for petty theft and reduced to misdemeanors. For this argument they rely on section 1157, which states: "Whenever a defendant is convicted of a crime . . . which is distinguished into degrees, the jury . . . must find the degree of the crime or attempted crime of which he is guilty. Upon the failure of the jury . . . to so determine, the degree of the crime . . . of which the defendant is guilty, shall be deemed to be of the lesser degree." (§ 1157) We do not find either argument persuasive.

Section 490a provides that the term embezzlement "shall hereafter be read and interpreted as if the word 'theft' were substituted therefor." (§ 490a.) "Theft is divided into two degrees, the first of which is termed grand theft; the second, petty theft." (§ 486.) Since embezzlement is theft and theft is divided into two degrees, it follows that embezzlement likewise is divided into two degrees. As the court explained in *People v.*

---

[8] We also find unpersuasive Berkovich's suggestion that "[t]he fact that appellant was acquitted of the vast majority of the charges against her speaks volumes as to whether the prosecution's arguments were given full credit by this jury." The jury found Berkovich guilty of misappropriating public moneys in connection with the same conduct, strongly suggesting it found her use of the American Express card improper. The numerous counts on which she was acquitted pertained to other instances of misappropriation and embezzlement that were factually distinct from her use of the American Express card.

*Stanfill* (1999) 76 Cal.App.4th 1137, 1143, "Embezzlement is a form of 'theft' (§ 490a) and, with exceptions not pertinent here, is made punishable with state prison time only if the use value of the subject property exceeds [$ 950]."[9]

Count 2 of the information alleged that defendants committed felony embezzlement in violation of section 504 and that the property embezzled had a "value exceeding Nine Hundred Fifty Dollars ($950) to wit: credit card charges made to Ivy Academia's American Express account." In keeping with the felony allegation, the court instructed the jury with a modified version of CALCRIM No. 1806 that effectively equated "felony" embezzlement with "grand theft by embezzlement." That instruction read in pertinent part: "The defendant is charged in Counts [*sic*] with grand theft by embezzlement in violation of Penal Code section 504."[10] The court also defined grand theft both orally and in writing with CALCRIM No. 1801, which provided in pertinent part: "If you conclude that the defendant committed a theft, you must decide whether the crime was grand theft or petty theft. The defendant committed grand theft if he or she stole property worth more than $950. [¶] . . . [¶] All other theft is petty theft. The People have the burden of proving beyond a reasonable doubt that the theft was grand theft rather than a lesser crime. If the People have not met this burden, you must find the defendant not guilty of grand theft."

For each defendant, the court provided two verdict forms for count 2: a guilty verdict form and a not guilty verdict form. None of the forms mentioned "grand theft," "petty theft," or the dollar value $950, or asked the jury to make findings regarding those

[9] When *Stanfill* was decided, the value threshold separating petty theft and grand theft was $400. (See former § 487, subd. (a) (1997).) In 2011, the threshold was raised to its current level, $950. (See § 487, subd. (a).) One of the "exceptions" not pertinent in *Stanfill* but pertinent here is when the embezzlement is of public funds. (See discussion, at pp. 31-34, *post.*)

[10] The written version of CALCRIM No. 1806 did not include count numbers despite the court's statement to counsel that it had handwritten them in. However, while orally instructing the jury, the court said, "I should have written in everybody's thing, let me see, 2 [8, 19, 22, 25, and 40] with grand theft by embezzlement violation of Penal Code section 504, does everybody have the numbers written in 2, [8, 19, 22, 25, and 40] good cause I personally did that [*sic*]."

terms. Instead, the verdict forms read "We, the jury in the above-entitled action, find the defendant . . ., **guilty** [or **not guilty**] of the crime of **EMBEZZLEMENT BY PUBLIC OR PRIVATE OFFICER**, in violation of Penal Code Section **504**, a felony, as charged in Count **2** of the Information." The jury returned verdicts of guilty as to both defendants.

This combination of instructions and verdict forms did not relieve the prosecution of its burden of proof. The People alleged and sought to prove only that defendants committed felony embezzlement. The court instructed the jury accordingly, stating that defendants were charged in count 2 with "grand theft by embezzlement," defining grand theft as theft of property exceeding $950 in value, and explaining that the jury "must find the defendant not guilty of grand theft" if the People failed to prove beyond a reasonable doubt that a grand theft occurred. We presume the jury understood and correlated these instructions (*People v. Martin* (2000) 78 Cal.App.4th 1107, 1111), which appeared on a single page of the instructions packet and squarely placed on the People the burden of proving the charged crime. The verdict forms' use of the word "felony" did not reduce this burden. The verdict forms expressly referred to the information, which also described the charged conduct only as a felony. The information also alleged that that the property at issue was "credit card charges made to Ivy Academia's American Express account" and that those charges were "of a value exceeding Nine Hundred Fifty Dollars ($950)."[11] These documents did not give the jury an option to convict defendants of anything less than grand theft by embezzlement. If the jury determined the People failed

---

[11] The prosecutor also argued to the jury that "the embezzlement charge does carry a minimum of $950. So, as such, one would have to find that the theft was $950 or more." These comments underscored the People's burden and the importance of the $950 threshold to a conviction on count 2. Defendants point out that this statement was imprecise, for a grand theft conviction requires the value of the property to *exceed* (rather than merely equal) $950. However, the court instructed the jury to follow the court's instructions rather than "anything concerning the law said by the attorneys in their arguments." The court's instructions correctly articulated the distinction between grand and petty theft.

30

to prove the amount embezzled exceeded $950, the instructions and verdict form properly required the jury to find the defendants not guilty on count 2.

Moreover, the instructions and verdict form did not violate section 1157 such that reduction of the convictions to a misdemeanor is required. The purpose of section 1157 is to ensure that the jury's determination of degree is clear when a verdict of varying degrees is permissible (*People v. Mendoza* (2000) 23 Cal.4th 896, 910), so that the defendant is protected from the risk that the degree of the crime could be increased after the judgment (*People v. Goodwin* (1988) 202 Cal.App.3d 940, 947). Just as applying section 1157 "where jury verdicts correctly permit only a first-degree felony murder conviction would do nothing to further this statutory purpose" (*People v. Mendoza*, *supra*, 23 Cal.4th at p. 910), applying section 1157 here, where the information, instructions, and verdict form permitted a conviction only for felony embezzlement, would not serve this purpose. "[W]here the trial court properly instructs the jury to find a defendant either not guilty or guilty" of felony embezzlement by grand theft, "there is simply no degree determination for the jury to make." (*Id.* at p. 911.) For that reason, requiring application of section 1157 here "would be both absurd and unreasonable, for it would require courts to deem a conviction to be of a degree that was never at issue and that the jury was neither asked nor permitted to consider." (*Ibid.*) Had the information alleged, or the verdict form stated, simply "embezzlement," with no indication of value or felony designation, the result might be different. Here, however, the jury's verdict specifically found defendants guilty of embezzlement "as charged in Count 2 of the Information," which required the jury to find that the property exceeded $950 in value to return a conviction. The jury implicitly—and necessarily—made the required factual findings to support the defendants' convictions for felony embezzlement.

**D.    Cumulative Instructional Error**

Because we have rejected defendants' claims of instructional error on count 2, there can be no cumulative error stemming from the same claims. (*People v. Tully* (2012) 54 Cal.4th 952, 1020.)

31

### E. The Court's Public Funds Finding

#### 1. Background

The information alleged in count 2 that the charged felonious "embezzlement and defalcation was of the public funds within the meaning of Penal Code Section 514." It similarly alleged that public funds were defalcated in embezzlement counts 4, 6, 8, 10, 19, and 40, but not in embezzlement counts 22 and 25. It is unclear why the allegation was not made as to counts 22 and 25, as both were paired with charges of misappropriation of public moneys stemming from the same conduct. [12]

"Section 514 defines the punishment for one convicted of embezzlement." (*Redondo, supra,* 19 Cal.App.4th at p. 1434.) It provides in relevant part: "'Every person guilty of embezzlement is punishable in the manner prescribed for theft of property of the value or kind embezzled; . . . if the embezzlement or defalcation is of the public funds of the United States, or of this state, or of any county or municipality within this state, the offense is a felony, and is punishable by imprisonment in the state prison; and the person so convicted is ineligible thereafter to any office of honor, trust, or profit in this state.'"

The first clause of section 514 clarifies that embezzlement generally is to be punished like its analogues, petty and grand theft. Thus, embezzlement of money or

---

[12] "The term 'public funds' is not defined in section 514" or anywhere else in the Penal Code. (*People v. Redondo* (1993) 19 Cal.App.4th 1428, 1434 (*Redondo*).) However, section 426 defines "public moneys" for the purposes of section 424, which criminalizes the misappropriation and false accounting of public moneys, as "all bonds and evidence of indebtedness, and all moneys belonging to the state, or any city, county, town, district, or public agency therein, and all moneys, bonds, and evidences of indebtedness received or held by state, county, district, city, town, or public agency officers in their official capacity." Whether the terms "public funds" and "public moneys" were intended to have the same or similar meanings is not entirely clear. (*Redondo*, *supra*, 19 Cal.App.4th at p. 1435.) The *Redondo* court appeared to equate "funds" with "money," however, holding that a "defendant is not culpable for a felony based on embezzlement of public funds under section 504 if what was stolen was not an available pecuniary resource of the public." (*Id.* at p. 1437.) The parties in this case likewise have treated the terms "public moneys" and "public funds" as synonyms and used them interchangeably.

32

property valued at $950 or less is punished like misdemeanor petty theft, "by fine not exceeding one thousand dollars ($1,000), or by imprisonment in the county jail not exceeding six months, or both." (§ 490.) Embezzlement of money or property valued at more than $950, is, like its grand theft counterpart, a "wobbler"—a crime that "in the trial court's discretion, may be sentenced alternately as [a] felon[y] or misdemeanor[]." (*People v. Superior Court (Alvarez)* (1997) 14 Cal.4th 968, 974; see also *People v. Stanfill*, *supra*, 76 Cal.App.4th at pp. 1144-1145 [embezzlement of property valued beyond threshold for grand theft is a "true wobbler for which the court had discretion to choose between misdemeanor and felony punishment"].) Section 489, subdivision (c) is the source of this discretion. It provides that grand theft, with narrow exceptions not applicable here, is punishable "by imprisonment in a county jail not exceeding one year or pursuant to subdivision (h) of Section 1170." (See also 2 Witkin & Epstein, Cal. Crim. Law 4th (2012) Crimes Against Property, § 8, p. 30 ["Grand theft is generally a felony-misdemeanor punishable by imprisonment in a county jail for not more than 1 year (misdemeanor), or under P.C. 1170(h) . . . ."].)

The second portion of section 514 significantly curtails the trial court's sentencing discretion where the property embezzled is "public funds." Under section 514, the embezzlement of public funds "is a felony, and is punishable by imprisonment in the state prison" (§ 514), "regardless of the value of the property embezzled" (*Redondo*, *supra*, 19 Cal.App.4th at p. 1434). The felony-misdemeanor distinction based on value is thus eliminated, as is the trial court's ability to choose misdemeanor punishment regardless of the amount embezzled. Additionally, section 514 bars those convicted of embezzling public funds from holding certain offices in the future.

The jury was not given an opportunity to find that the property embezzled in count 2 (or any of the other embezzlement counts) was public funds. Neither the instructions nor verdict forms pertaining to count 2 (or the other embezzlement counts) mentioned public funds. At the sentencing hearing, the People asked the court to make "a Penal Code section 514 finding . . . in light of them being public officials" and noted that such a finding "would have an impact in terms of the sentencing." The People reiterated their

33

request later in the hearing, when the court had almost concluded sentencing Selivanov, explaining that such a finding "would render the defendants ineligible to hold public office." Over defendants' "strenuous objection," the court found "that these were public funds and that he embezzled public funds, and the public funds being from the school, Ivy Academia, which is a public school."

Defendants now contend that the court's finding violated *Apprendi v. New Jersey* (2000) 530 U.S. 466 (*Apprendi*) and *Alleyne v. United States* (2013) 133 S.Ct. 2151 (*Alleyne*), which require any fact that increases the statutory maximum (*Apprendi*) or mandatory minimum (*Alleyne*) punishment to be found by a jury beyond a reasonable doubt. They argue that by making the contested finding, the court impermissibly increased their penalties "in four distinct ways . . . (1) removal of Penal Code § 504 from 'wobbler' status; (2) mandatory state prison incarceration where probation is denied; (3) post-state prison parole; and (4) imposition of a parole revocation restitution fine."[13] We need reach only the first of defendants' alternative arguments as it is correct. The public funds finding had the effect of eliminating the court's discretion to sentence them to a misdemeanor sentence to be served in county jail. The finding accordingly should have been made by the jury. The error was harmless in this case, however, because the record reveals beyond a reasonable doubt that the jury would have made the same finding had it been asked to do so.

### 2. Applicable Legal Principles

In *Apprendi*, the United States Supreme Court held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." (*Apprendi, supra*, 530 U.S. at p. 490.) The Court explained in a footnote that "facts that expose a defendant to a punishment greater than the one otherwise legally prescribed

---

[13] Defendants do not argue in their opening brief and only make a cursory suggestion in reply that the court's finding increased their penalties by making them ineligible to hold public office. They accordingly have forfeited this contention, and we do not consider it here. (*People v. Bryant* (2014) 60 Cal.4th 335, 408.)

were by definition 'elements' of a separate legal offense." (*Id.* at p. 483, fn. 10.) A few years later, in *Blakely v. Washington* (2004) 542 U.S. 296, the Court further clarified that "the 'statutory maximum' for *Apprendi* purposes is the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant. [Citations.] In other words, the relevant 'statutory maximum is not the maximum sentence a judge may impose after finding additional facts, but the maximum he may impose without any additional findings." (*Blakely*, *supra*, 542 U.S. at p. 303 [emphases omitted].)

The Supreme Court initially treated statutory minimums differently. In *Harris v. United States* (2002) 536 U.S. 545 (*Harris*) the Court held that judicial factfinding that increased the mandatory minimum sentence was permissible under the Sixth Amendment. However, the Supreme Court extended the reasoning of *Apprendi* in *Alleyne*, *supra*, 133 S.Ct. 2151, which overruled *Harris* and held that any fact that increases a defendant's mandatory minimum sentence must be found by a jury beyond a reasonable doubt. (*Alleyne*, *supra*, 133 S.Ct. at pp. 2155, 2162-2163.)

In *Alleyne*, the defendant was convicted of robbery affecting interstate commerce (18 U.S.C. § 1951(a)), a crime that carried a penalty of five years to life. A defendant who brandished a firearm during that crime was subject to a heightened penalty of seven years to life. (*Alleyne*, *supra*, 133 S.Ct. at pp. 2155-2156.) Although the jury did not find that defendant brandished a firearm, the probation report recommended a sentence of seven years based on brandishing. The trial court found brandishing based on a preponderance of the evidence and sentenced defendant to seven years in prison. (*Id.* at p. 2156.) The Court of Appeal affirmed based on *Harris*. (*Ibid.*) The Supreme Court reversed and overruled *Harris*. It held that "*Apprendi*'s definition of 'elements' necessarily includes not only facts that increase the ceiling [of available punishment], but also those that increase the floor. Both kinds of facts alter the prescribed range of sentences to which a defendant is exposed and do so in a manner that aggravates the punishment." (*Id.* at p. 2158.) Under *Alleyne*, "[f]acts that increase the mandatory minimum sentence are therefore elements and must be submitted to the jury and found

35

beyond a reasonable doubt." (*Ibid.*) "It is no answer to say that the defendant could have received the same sentence with or without that fact." (*Id.* at p. 2162.) If a fact increases either the punishment floor or ceiling, it must be found by a jury beyond a reasonable doubt.

*Alleyne* also made clear, however, that "broad sentencing discretion, informed by judicial factfinding, does not violate the Sixth Amendment." (*Alleyne*, *supra*, 133 S.Ct. at p. 2163.) "'[E]stablishing what punishment is available by law and setting a specific punishment within the bounds that the law has prescribed are two different things.' [Citation.]" (*Ibid.*) Accordingly, a judge may make factual findings that influence his or her sentencing discretion, but may not make factual findings that aggravate the legally prescribed punishment. (See *id.* at pp. 2162-2163.) For instance, "[t]rial judges often find facts about the nature of the offense or the character of the defendant in determining, for example, the length of supervised release following service of a prison sentence; required attendance at drug rehabilitation programs or terms of community service; and the imposition of statutorily prescribed fines and orders of restitution. [Citation.] Intruding *Apprendi*'s rule into these decisions on sentencing choices or accoutrements surely would cut the rule loose from its moorings." (*Oregon v. Ice* (2009) 555 U.S. 160, 171-172.)

### 3. Analysis

Defendants contend that the court's public funds finding violated *Alleyne* by mandating that the embezzlement be treated as a felony rather than a wobbler. We agree. However, we conclude that the error was harmless beyond a reasonable doubt.

The information charged defendants in count 2 with felony embezzlement. This wobbler offense, like all others, properly was regarded as a felony throughout trial "for all purposes *until imposition of sentence or judgment.*" (*People v. McElroy* (2005) 126 Cal.App.4th 874, 880 [emphasis added].) From the outset of the case, then, defendants were subject to punishment for a felony—a custodial term of 16 months, two years, or three years—by virtue of the People's allegation that they embezzled "property being of a value exceeding Nine Hundred Fifty Dollars ($950) to wit: credit card charges made to

36

Ivy Academia's American Express account." However, the felony sentencing triad represented only the punishment ceiling defendants faced. Because embezzlement is a wobbler, the felony designation was applicable only "until imposition of sentence or judgment." At that point, the trial court had the discretion to choose whether defendants should be subject to felony or misdemeanor punishment. Thus, the punishment floor defendants faced was that provided in section 489, subdivision (c), "imprisonment in a county jail not exceeding one year." Even if it was unlikely that the trial court would exercise its discretion to sentence defendants as if they were convicted for misdemeanor embezzlement, it had that option.

After the public funds finding was made, however, the trial court lost its discretion to sentence defendants to a misdemeanor punishment. Under section 514, the embezzlement of public funds "is a felony, and is punishable by imprisonment in the state prison." (§ 514.) The minimum punishment to which defendants were subject accordingly rose to the low term of the felony triad, 16 months, based on the trial court's finding. The finding increased the mandatory minimum punishment and therefore under *Alleyne* must be considered an element of the crime required to be submitted to the jury and found beyond a reasonable doubt.[14]

The People argue that "[b]ecause nothing about the section 514 finding exposes a defendant to a longer sentence than the one available absent the finding, there is nothing

---

[14] We note that the crime of "embezzlement of public money" has a different statute of limitations than embezzlement of non-public money, which lends support to the conclusion that a "public funds" finding is an element of a separate crime. (Compare § 799 ["Prosecution for an offense punishable by death or by imprisonment in the state prison for life or without the possibility of parole, or for the embezzlement of public money, may be commenced at any time."] with § 801 ["Except as provided in Sections 799 and 800, prosecution for an offense punishable by imprisonment in the state prison or pursuant to subdivision (h) of Section 1170 shall be commenced within three years after commission of the offense."] and § 801.5 ["Notwithstanding Section 801 or any other provision of law, prosecution for any offense described in subdivision (c) of Section 803 [including grand theft] shall be commenced within four years after discovery of the commission of the offense, or within four years after the completion of the offense, whichever is later."].)

inconsistent about the trial court's rejection of this very argument and the principles stated in *Alleyne*." This argument ignores express language in *Alleyne*, which states that "It is no answer to say that the defendant could have received the same sentence with or without that fact." (*Alleyne*, *supra*, 133 S.Ct. at p. 2162.) It is true that defendants were subject to felony punishment with or without the finding. With the finding, however, defendants were subject *only* to felony punishment. "The essential point is that the aggravating fact produced a higher range, which, in turn, conclusively indicates that the fact is an element of a distinct and aggravated crime. It must, therefore, be submitted to the jury and found beyond a reasonable doubt." (*Id.* at pp. 2162-2163.)

The People's analogy to *People v. Benitez* (2005) 127 Cal.App.4th 1274 also is not persuasive. In *Benitez*, a jury found the defendant guilty of 30 lewd and lascivious acts upon victims under the age of 14 and further found that the offenses involved more than one victim. Through a series of statutory cross-references, these findings made the defendant ineligible for probation. The jury did not separately find the defendant ineligible for probation, however, and defendant argued the absence of such a finding violated *Blakely*. (See *Benitez*, *supra*, 127 Cal.App.4th at p. 1277-1278.) The Court of Appeal rejected defendant's argument. It held that the proviso in former section 667.61, subdivision (c)(7) disqualifying certain sex offenders from probation "is not an element of the enhancement to be negated upon proof to a jury." (*Id.* at p. 1278.) It reasoned that eligibility for probation was not subject to *Blakely* because "[f]inding a defendant ineligible for probation is not a form of punishment, because probation itself is an act of clemency on the part of the trial court," and "a defendant's eligibility for probation results in a *reduction* rather than an increase in the sentence prescribed for his offenses." (*Ibid.* [emphasis in original])

Here, the public funds finding increased rather than deceased the range of punishments to which defendants were subject. Although the potential for misdemeanor sentencing was, like probation, within the trial court's discretion, it was still a form of punishment. The elimination of that possibility raised the sentence prescribed for defendants' offenses. And even if the situations were analogous, the jury in *Benitez* made

38

factual findings that eliminated the possibility of probation.  Those findings were made by the court here.

Defendants and the People both correctly recognize that *Apprendi* error is subject to harmless error review under *Chapman v. California* (1967) 386 U.S. 18, 24.  (*People v. Davis* (2005) 36 Cal.4th 510, 564.)  Thus, "if a reviewing court concludes, beyond a reasonable doubt, that the jury, applying the beyond-a-reasonable-doubt standard, unquestionably would have found true" the finding in question, "the Sixth Amendment error properly may be found harmless."  (*People v. Sandoval* (2007) 41 Cal.4th 825, 839.)  That standard is met here.

Regardless of whether all funds Ivy Academia possessed were public funds as a matter of law there is no question that, had it been presented with the question, the jury would have found the money defendants embezzled in count 2 to be public funds as a matter of fact.  Throughout trial, everyone, including defense counsel and defense witnesses, spoke almost exclusively in terms of "public moneys" and "public funds."  The only disputes relevant to the American Express charges at issue in count 2 concerned whether they were made to advance an educational purpose, a requirement for the expenditure of public funds.  Defendants did not contest the threshold issue of the provenance of the funds used to pay for the American Express charges.  As Selivanov argued in closing, "[w]e know from the evidence that the funds that were coming to Ivy Academia were from two sources primarily, categorical block grant funding and general purpose funding, and the evidence was that money that was categorical block grant money or general purpose money essentially needed to be spent for school related purposes in connection with the operation of the school."  Berkovich put it even more explicitly:  "[t]his is a private entity receiving public funds."  We are convinced beyond a reasonable doubt the jury would have agreed and made the public funds finding had it been given the opportunity to do so.  Accordingly, any *Apprendi* error the court may have introduced by making the public funds finding was harmless.

## II. Other Embezzlement Convictions (counts 8, 19, 22, 25 & 40)

Selivanov challenges his other embezzlement convictions—those stemming from the series of $5,000 and $3,000 transfers made to EGeneration in 2008 after the $237,000 rent liability was booked into the Due to EGeneration account (count 8), the three transfers of $25,000, $20,000, and $20,000 made to EGeneration in 2007 (counts 19, 22, and 25, respectively), and the approximately $126,000 in loan payments Ivy Academia made to Western Commercial Bank after transferring liability for the Western Commercial Bank loan to EGeneration (count 40).[15] First, he argues that none of the embezzlement convictions was supported by substantial evidence because "all of the funds transferred to his account were his own" and he had authority to transfer them. As to count 40 specifically, Selivanov argues that the loan payments were made pursuant to a legitimate contract and funds never were entrusted to him. Second, he contends that the trial court erred by failing to provide the jury with an instruction on the claim-of-right defense, thereby precluding him from presenting a defense and violating his right to a fair trial. We do not find these contentions persuasive.

### A. Sufficiency of the Evidence

Selivanov contends that none of his embezzlement convictions was supported by substantial evidence. After reviewing the entire record in the light most favorable to the verdict (*People v. Clark*, *supra*, 52 Cal.4th at p. 943), we conclude that ample evidence supports the convictions.

"'Embezzlement is the fraudulent appropriation of property by a person to whom it has been [e]ntrusted.' (§ 503.) The elements of embezzlement are: '1. An owner entrusted his/her property to the defendant; 2. The owner did so because he/she trusted the defendant; 3. The defendant fraudulently converted that property for his/her own

---

[15] Selivanov also contends that his money laundering convictions on counts 23 and 26 (§ 186.10, subd. (a)) are predicated upon the same conduct as the embezzlement convictions in counts 22 and 25 and therefore cannot stand if those convictions are reversed. Because we affirm the embezzlement convictions, we affirm the money laundering convictions as well.

benefit; [and] 4.  When the defendant converted the property, he/she intended to deprive the owner of its use.'  (CALCRIM No. 1806.)"  (*People v. Fenderson* (2010) 188 Cal.App.4th 625, 636-637.)

Selivanov contends that counts 8, 19, 22, and 25—the counts involving Ivy Academia's monetary transfers to EGeneration—fail at the first element because one cannot be guilty of embezzling his or her own property.  According to Selivanov, the Due to Management account demonstrated at all relevant times that Ivy Academia owed him more than he transferred to his business entity EGeneration, and "[f]or this reason alone," his embezzlement convictions cannot stand.  We do not agree.  Even if Ivy Academia had a legitimate debt to Selivanov as reflected in the Due to Management account, the money that Selivanov caused Ivy Academia to transfer to EGeneration did not become his property simply by virtue of that indebtedness.  It remained the property of Ivy Academia, which entrusted Selivanov to allocate the money for the benefit of the school rather than for his own personal benefit.  The jury readily could have concluded from Selivanov's failure to document these withdrawals as reductions in the amount owing in the Due to Management account, his failure to document them as income for tax purposes, and his failure to transfer his purported salary to his personal account that Selivanov was not in fact recouping the deferred salary he was owed.  The People also presented evidence that several of the contested transfers were made only after the rent increase (which Balbin described as a "sham transaction") inflated the amounts Ivy Academia purportedly owed to EGeneration, and that EGeneration in other instances used the transferred funds almost immediately to make payments it otherwise would not have been able to afford.  The jury could have concluded from this evidence that Selivanov was not owed the money he took, and that he took the money with fraudulent intent.

Selivanov also contends there can be no embezzlement because he was authorized to repay himself from the funds with which he was entrusted.  While it is true that Selivanov's position as the executive director of Ivy Academia vested him with authority to handle financial matters, the People presented evidence that the board approved the

41

final series of salary payments to Selivanov and Berkovich in 2010. The jury could conclude from this evidence that board approval was required for such payments, and further could conclude from the absence of evidence of any such approval that the board did not authorize Selivanov's previous withdrawals. The People also introduced evidence that the board-approved salary payments Ivy Academia made to defendants in 2008 were documented on 1099 tax forms. The jury could infer from the absence of tax forms for the transfers alleged in counts 8, 19, 22, and 25 that these earlier transactions were not made via authorized channels.

As to count 40, Selivanov contends that any funds he "supposedly took from Ivy Academia" to pay the Western Commercial Bank loan "were taken under a valid contract," and "one cannot be guilty of embezzling money when he has acquired title to it by contract or sale. (*People v. Parker* (1965) 235 Cal.App.2d 100, 109.)" This is too broad a read of *People v. Parker*, which affirmed the embezzlement conviction of a building contractor who used down payments given to him for his own purposes rather than depositing them into accounts at a title company as he had promised. (*People v. Parker*, *supra*, 235 Cal.App.2d at p. 109.) The proposition for which Selivanov cites *Parker* comes from *People v. Holder* (1921) 53 Cal.App.45, in which the Court of Appeal reversed the embezzlement conviction of a building contractor. The contractor in *Holder* used the money his customers paid him for his own purposes rather than to buy materials for the homes he was building. The Court of Appeal concluded that the contracts governing the contractor's relationship with his customers were such that the money the customers gave to the contractor became his upon receipt. Therefore, the money could not be embezzled because it was the defendant's own property, not the property of another that had been entrusted to him. (See *People v. Holder*, *supra*, 53 Cal.App.45 at p. 48.)

This case is different. The Assignment Assumption of Lease was an agreement between Ivy Academia and EGeneration, not between Ivy Academia and Selivanov, or between Ivy Academia and Western Commercial Bank. Under the Assignment Assumption of Lease, the money in Ivy Academia's accounts remained the property of

Ivy Academia, which entrusted Selivanov to oversee it. Neither Selivanov nor EGeneration nor Western Commercial Bank acquired title to Ivy Academia's money under the contract. Moreover, the People presented substantial evidence that the rent increase that purportedly prompted the payments to Western Commercial Bank was a sham transaction despite the board's approval. The jury reasonably could have concluded that Ivy Academia had no obligation to continue to make the loan payments it was making to EGeneration's purported "designees," J & N Amoroso Family Investments and Western Commercial Bank, particularly since Amoroso knew nothing of the rent arrangement, the board was not informed of the loan transfer until more than a year after its effective date, and Western Commercial Bank was not informed about the loan transfer for at least five months after the board approved it.

### B. Claim-of-Right Defense Instruction

#### 1. Background

Selivanov's theory at trial was that the payments Ivy Academia made to EGeneration at his direction could not constitute embezzlement as alleged in counts 8, 19, 22, and 25, because Ivy Academia owed him deferred salary, as reflected in the Due to Management account.[16] That is, the "transfer of that money was justified because that belonged to us." The court told him it had "no problem with [him] making that argument," but denied his request to instruct the jury on the claim-of-right defense, which "provides that a defendant's good faith belief, even if mistakenly held, that he has a right or claim to property he takes from another negates the felonious intent necessary for conviction of theft or robbery." (*People v. Tufunga* (1999) 21 Cal.4th 935, 938

---

[16] Selivanov quotes liberally in his briefing the trial court's discussion of the claim-of-right defense as it applied to count 2, the embezzlement count involving the American Express charges. However, Selivanov explicitly stated, both in his briefs and at oral argument, that he "did not associate the claim-of-right defense with his AMEX Card charges" and is not claiming this particular instructional error on that count. Although Berkovich requested a claim-of-right instruction as to count 2, she does not now argue that she was entitled to a claim-of-right instruction on count 2 or any other embezzlement count, nor does she join Selivanov's argument to the extent it may be applicable to count 2, the only embezzlement count on which she was convicted.

(*Tufunga*).)  Citing *People v. Barnett* (1998) 17 Cal.4th 1044, the court explained that it understood the claim-of-right defense to be applicable only where a defendant claimed ownership of specific, identifiable money or property.  In the court's view, "claim of right requires you to be able to identify and say this money exactly is my money," and "all this money was flown all over the place, and there is no identifiable money that you can point to and say that was the money that I was owed for my salary Due to Management account that was the money that I was owed for my loan."

Selivanov also asked the court to provide a claim-of-right instruction on count 40, the embezzlement count stemming from Ivy Academia's continued payments on the Western Commercial Bank loan.  He contended that claim-of-right should be a "slam dunk" on that count because "it's the most open and transparent thing we did," going through the board and the bank and making the payments "openly and validly under a claim of right."  The court disagreed, stating, "if you do it openly and validly you usually do it before you actually do the transaction."

The court gave the jury an instruction regarding good faith.  Using the CALCRIM instruction for embezzlement, CALCRIM No. 1806, the court told jurors that "A good faith belief in acting with authorization to use the property is a defense.  [¶]  In deciding whether the defendant believed that he or she had a right to the property and whether he or she held that belief in good faith, consider all the facts known to him or her at the time he or she obtained the property, along with all the other evidence in the case.  The defendant may hold a belief in good faith even if the belief is mistaken or unreasonable.  But if the defendant was aware of facts that made that belief completely unreasonable, you may conclude that the belief was not held in good faith."  The court separately instructed the jury on mistake of fact:  "An act committed or an omission made in ignorance or by reason of a mistake of fact which disproves any criminal intent is not a crime.  [¶]  Thus a person is not guilty of a specific intent crime which includes the crimes charging Theft by Embezzlement and Money laundering if he or she commits an act or omits to act under an actual belief in the existence of certain facts and

44

circumstances which, if true, would make the act or omission lawful." (CALJIC No. 4.35.)

During his closing argument, Selivanov told the jury that although "much of the conduct at issue here is not in dispute," "there will be a question about what was Mr. Selivanov thinking when he entered into certain transactions." He emphasized that the board approved both the rent increase and lease transactions, and that the transactions were reviewed by Ivy Academia's outside auditors. With respect to the transfers of money to EGeneration, Selivanov argued that "a debt to EGeneration and AJFK is a debt to Mr. Selivanov and Miss Berkovich," and that because the Due to Management account at all relevant times had a balance "easily in excess of the transfers at issue here," "he could take the money back as repayment."

The jury found Selivanov guilty on all of the embezzlement counts. It further found that Selivanov, "with the intent to do so, took money exceeding $65,000.00, within the meaning of Penal Code section 12022.6(a)(1)."

### 2. Analysis

The claim-of-right defense originated in the common law as a defense to larceny or robbery (*Tufunga*, *supra*, 21 Cal.4th at p. 945), which, like embezzlement, require the specific intent to permanently deprive another of property. "'It has long been the rule in this state and generally throughout the country that a bona fide belief, even though mistakenly held, that one has a right or claim to the property negates felonious intent. [Citations.] A belief that the property taken belongs to the taker [citation], or that he had a right to retake goods sold [citation] is sufficient to preclude felonious intent. Felonious intent exists only if the actor intends to take the property of another without believing in good faith that he has a right or claim to it. [Citation.]' [Citation.]" (*People v. Barnett*, *supra*, 17 Cal.4th at p. 1143.)

The Legislature codified the claim-of-right defense in 1872. Unchanged since, section 511 provides: "Upon any indictment for embezzlement, it is a sufficient defense that the property was appropriated openly and avowedly, and under a claim of title preferred in good faith, even though such claim is untenable. But this provision does not

45

excuse the unlawful retention of the property of another to offset or pay demands held against him." (§ 511.) The good-faith nature of a defendant's belief in his or her right to the property taken is a crucial element; the claim-of-right defense is not available if a defendant was aware of contrary facts that rendered his or her belief wholly unreasonable. (*People v. Stewart* (1976) 16 Cal.3d 133, 140.) The claim-of-right defense also is inapplicable where a defendant attempts to conceal the taking (*id.* at p. 141), where the claim of right to the property arises from "notoriously illegal" activity (*People v. Hendricks* (1988) 44 Cal.3d 635, 642), or "where an employee unilaterally determines that he or she is entitled to certain wages and thereafter, without authorization, appropriates the property of the employer in purported payment of such wages" (*People v. Creath* (1995) 31 Cal.App.4th 312, 318).

"'[A] trial court is not required to instruct on a claim of-right defense unless there is evidence to support an inference that [the defendant] acted with a subjective belief he or she had a lawful claim on the property.' [Citations.]" (*Tufunga*, *supra*, 21 Cal.4th at p. 944.) "'"In evaluating the evidence to determine whether a requested instruction should be given, the trial court should not measure its substantiality by weighing the credibility [of the witnesses]. . . . Doubts as to the sufficiency of the evidence to warrant instructions should be resolved in favor of the accused. [Citations.]"' [Citation.]" (*Ibid.*) Selivanov contends the evidence was sufficient to support the requisite inference here. We agree.

Selivanov presented testimony supporting his theory that he had a good faith claim of right to the funds at issue. Defense expert Jan Goren testified that the Due to Management account could be bundled together with the Due to Academy and Due to EGeneration accounts, and the evidence showed that the Due to Management account reflected a large amount owed to defendants at all relevant times. Of course, other evidence showed that Selivanov made the payments to his business rather than to himself, did not document the transfers in the Due to Management account (though he did document them elsewhere in Ivy Academia's QuickBooks), and did not prepare tax forms indicating he received salary payments. However, these conflicts in the evidence were

46

for the jury to resolve; we cannot, as the People suggest, dismiss Selivanov's evidence as "entirely implausible."  We likewise cannot disregard Selivanov's evidence that the loan payments were made in good faith, pursuant to a legitimate contract, despite the ample evidence in the record suggesting otherwise.  Nor can we embrace the trial court's rationale that the defense was inapplicable because the money secreted was not identifiable as Selivanov's or Western Commercial Bank's.  The cases it relied upon for that principle addressed the defense's application in the robbery context, where strong policy concerns disfavoring self-help through force or violence necessitate a narrow construction of the defense.  (See *Tufunga*, *supra*, 21 Cal.4th at pp. 938, 948-950; *People v. Barnett*, *supra*, 17 Cal.4th at pp. 1143-1146.)

We disagree with Selivanov, however, to the extent he contends that "the jury was left unequipped to consider the ample evidence at trial pointing to [his] lack of guilt" under a claim-of-right theory.  "[A] failure to instruct where there is a duty to do so can be cured if it is shown that 'the factual question posed by the omitted instruction was necessarily resolved adversely to the defendant under other, properly given instructions.' [Citation.]" (*People v. Stewart*, *supra*, 16 Cal.3d at p. 141.)[17]  That showing was made here.  The court instructed the jury on good faith, a necessary element of the claim-of-right defense, and the jury nonetheless returned guilty verdicts on all of the embezzlement counts.  By making these findings, the jury demonstrated that it necessarily rejected one of the key elements of the claim-of-right defense.

Selivanov asserts that the court's instruction on good faith was too narrow, because it "only told the jury that acting with authorization could serve as a defense," rather than informing the jury that claim of title was at issue.  He relies on *People v.*

---

[17] "It is not clear what standard applies to cases involving error in instructing on the claim-of-right defense.  In cases involving other kinds of defenses, courts have applied the [*People v.*]*Watson* [(1956) 46 Cal.2d 818, 836] standard." (*People v. Russell* (2006) 144 Cal.App.4th 1415, 1431, overruled in part by *People v. Covarrubias* (2016) 1 Cal.5th 838, 874; see also *People v. Sojka* (2011) 196 Cal.App.4th 733, 738.)  We find the error harmless even under the more stringent standard set forth in *Chapman v. California, supra,* 386 U.S. at p. 24.)

*Threestar* (1985) 167 Cal.App.3d 747 (*Threestar*). There, the defendant was accused of embezzlement in connection with his retention and sale of audio speaker stands after the business for which he worked disbanded. The prosecution theorized that the defendant and the owner of the business agreed that defendant would sell the business's current inventory of stands on a commission basis. Contrary to this arrangement, defendant ordered additional stands and sold them without informing the business owner or distributing her full share of the profits to her. Defendant claimed that no agreement existed. According to his theory, he owned the patent rights to the stands and made voluntary payments to the business owner "to help her recoup her losses in the corporation." (See *Threestar*, *supra*, 167 Cal.App.3d at pp. 751-752.) He claimed he had a good faith belief that he could lawfully sell the speaker stands, and that the trial court had a sua sponte duty to instruct the jury on the claim-of-right defense. (*Id.* at p. 753.) We agreed. (*Ibid.*) We further concluded that the instruction the court delivered could have misled the jury. We held that the pertinent part of the instruction, "if one takes business proceeds in the good faith belief he has permission to keep such proceeds he is not guilty of theft," did not "address the defense theory of the evidence that no such sales agreement existed." (*Id.* at p. 756.) We found the error prejudicial because, under the instructions given, "the jury did not necessarily find that appellant lacked a good faith belief that he was acting pursuant to a lawful 'claim of title' based on his patent rights." (*Id.* at pp. 756-757.) We also noted that the instructions given omitted mention of the "open and avowed" element of the claim-of-right defense. (*Id.* at p. 756.)

*Threestar* is distinguishable. There, the instruction the court gave did not "address the defense theory of the evidence that no such sales agreement existed." (*Threestar*, *supra*, at p. 756.) That is, it "did not advise the jury that [defendant's] good faith belief based on his patent rights could constitute a defense to embezzlement." (*Ibid.*) Even if the jury credited defendant's evidence to that effect, the jury instructions did not inform the jurors that they could find defendant not guilty. Here, the jury instructions the court gave reflected defendant's theory of the case. The good faith instruction the court delivered here, part of the CALCRIM instruction on embezzlement (to which Selivanov

48

did not object), informed the jury not only that "A good faith belief in acting with authorization to use the property is a defense," but also that a defendant's belief "that he or she *had a right to the property*" is a defense. Thus, it accurately informed the jury that a defendant could negate his or her felonious intent by demonstrating a good faith belief that he or she was authorized to use *or* legally possess the property. Unlike *Threestar*, where the jury instruction was misleading because it did not comport with the defendant's alleged justification for selling the goods and keeping the profits, the good faith instruction here aligned with Selivanov's theory of the case, namely that he had a right to the money he transferred to EGeneration because he was owed deferred salary payments.

Selivanov also points to our observation in *Threestar* that the trial court in that case failed to instruct on the "openly and avowedly" element of the claim-of-right defense. (See *Threestar*, *supra*, 167 Cal.App.3d at p. 756.) This dicta does not compel the conclusion that Selivanov was prejudiced here. Even if the omission of the openly and avowedly element was the deciding factor in *Threestar*, which it plainly was not, the omission of such an instruction here was not prejudicial to Selivanov. The jury's findings that Selivanov acted with the intent to deprive Ivy Academia of the funds it had entrusted to him demonstrate that the jury necessarily would have rejected the claim-of-right defense even if it had concluded Selivanov took the property openly and avowedly.

## III. Corporate Tax Convictions (counts 32-36)

The jury found Selivanov guilty of filing false corporate tax returns for AJFK and EGeneration for the years 2004-2008. (Rev. & Tax. Code, § 19705, subd. (a).) Selivanov contends those convictions must be reversed because the trial court admitted QuickBooks records for AJFK and EGeneration absent a proper foundation or exception to the hearsay rule. He further argues that the People failed to prove an essential element of the crime, namely that he did not believe the statements in the returns were true and correct as to every material matter. We do not find either of these contentions persuasive.

49

### A.    Admission of AJFK/EGeneration QuickBooks Printouts (Exhibit 105)

#### 1.    Background

While LAUSD forensic accountant Delos Santos was on the stand, the People identified as Exhibit 105 a collection of AJFK/EGeneration QuickBooks printouts. Selivanov objected to the People's attempt to discuss the printouts with Delos Santos on the grounds of "foundation on the business records."  The court overruled the objection, stating that expert witnesses "can rely on hearsay in order to reach their opinion."  The court explained to the jury that, "at this moment," Exhibit 105 was "not necessarily coming in for the truth of the matter, but it is coming in to help explain what her opinion is and you may consider it as such."  Delos Santos proceeded to testify that she was familiar with the QuickBook documents, which had been obtained "[f]rom the search warrant" of Ivy Academia.  Delos Santos also testified that Selivanov told her in 2007 that there were no accounting books or electronic records for EGeneration.  Prosecution witness Michael Atkinson previously had testified to the same thing.

Selivanov objected again when the prosecutor asked Delos Santos if the QuickBooks documents appeared to have been produced in the ordinary course of business.  At sidebar, Selivanov acknowledged that an electronic copy of the QuickBooks had been found on an Ivy Academia server but argued that there had been no testimony about who prepared them or whether they were kept in the ordinary course of business.[18] The People told the court "we want it to come in for the truth" and explicitly invoked the business records exception to the hearsay rule as a basis to achieve that aim.  The prosecutor argued that someone like Delos Santos, who was "eminently qualified on QuickBooks," could "testify that all QuickBooks are kept according to the way the software directs them to be kept."  The court ruled, "I am allowing them at this moment for the expert relied on them and reached their opinions, and it is coming in [for] the truth of the matter."  The court deferred ruling on the admissibility of the QuickBook printouts

---

[18] Ivy Academia bookkeeper Pilyavskaya testified that she did not do accounting for defendants' other business entities.

under the business records exception to the hearsay rule and asked the parties to research the issue further.

During the lunch recess, the court and counsel discussed two cases the court located that addressed the business records exception, *People v. Dean* (2009) 174 Cal.App.4th 186 and *People v. Hovarter* (2008) 44 Cal.4th 983. The court opined that both cases "seem to speak that you have to have people that can lay a foundation that they have some familiarity with the records, not just some person who is an auditor looking at records and then laying a foundation based on that." The court accordingly expressed "grave doubts" as to whether the QuickBooks printouts were admissible for their truth pursuant to the business records exception. It noted, however, that "one of the ways to get around that" might be by arguing that "those are admissions or you know or adoptive [admissions] or something like that."

Two days later, outside the presence of the jury, the parties again addressed the admissibility of the QuickBooks printouts for their truth as business records. Neither side presented the court with any case authority, and the People did not accept the court's invitation to argue that the printouts were admissions. Instead, the People suggested that the printouts were not in accordance with AJFK/EGeneration's actual expenditures, as reflected by a collection of checks and credit card statements identified as Exhibit 106. The People contended, without citing any authority, that "the fact that these books are going to be shown to be false, meaning they don't match up to what was filed in the return shows they are not being offered for their truth. They are being offered as circumstantial evidence that the defendant [Selivanov] knew he was lying on his tax returns. It will be tied circumstantially." The court agreed with "this last argument," ruling, "[i]t comes in for non-hearsay to show there is another set of books and whether they are true or not. I will allow them in."

51

The People subsequently used the QuickBooks printouts,[19] Exhibit 106, and various AJFK/EGeneration tax returns with Franchise Tax Board witness Rigoberto Salazar. He testified that numerous items booked as rent or supplies expenses in the QuickBooks and deducted as such on AJFK/EGeneration's tax returns were not in fact rent or supplies expenses but rather payments on a credit card used to purchase items from businesses including Domino's, El Pollo Loco, Albertsons, and Victoria's Secret. According to Salazar, the information on the tax returns "was based on the QuickBooks."

The admissibility of the QuickBooks printouts arose for a third time at the close of the People's case-in-chief. Again, the court ruled the documents were admissible. It explained: "I am allowing the records in. I am treating this just like you would receive a letter or another item. I had a series of cases on a piece of paper, but basically it is coming in for a non-hearsay purpose to show not only that the fact that the records [*sic*] but these kind of records were found in a location and the school run by these people and their indicia they knew about these records and had some familiarity or some connection with these records cause of the location they were found just like if you found a telephone bill or a letter addressed to someone you could then jump from that to the fact that that person exercised dominion and control over that location, and I think that the fact that they were found on a server at the school, that these people were running, he was the executive director, the wife was the president, I will allow it for that reason. . . ." The court further stated that it was admitting Exhibit 105 "basically for all purposes because I think there is some indicia that this is connected to the defendants," and explained that if it had come in only to support an expert's opinion, "I might not admit it for the jury to look at, and you would just have to rely and argue from the testimony of the witness."

---

[19] They actually used Exhibit 94, a spreadsheet Franchise Tax Board special agent Rigoberto Salazar prepared using data from Exhibit 105. Selivanov objected to Exhibit 94 "on the basis of the discussion that we had at side-bar earlier," and the court overruled the objection.

### 2. Analysis

Hearsay is "evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated." (Evid. Code, § 1200, subd. (a).) Hearsay is not admissible unless it meets the requirements of one of the exceptions set forth in Evidence Code sections 1220-1390. (Evid. Code, § 1200, subd. (b); see also *People v. DeHoyos* (2013) 57 Cal.4th 79, 132.) A trial court's ultimate ruling on admissibility "implies whatever finding of fact is prerequisite thereto; a separate or formal finding is unnecessary unless required by statute." (Evid. Code, § 402, subd. (c).) We review the trial court's conclusions regarding foundational facts for substantial evidence and its decision to admit or exclude a hearsay statement for abuse of discretion. (*People v. DeHoyos*, *supra*, 57 Cal.4th at p. 132.) We review the ruling, not the rationale; "[t]he ruling must be upheld if the evidence was admissible under any hearsay exception." (*People v. Karis* (1988) 46 Cal.3d 612, 635.)

Our review is complicated by the People's shifting explanations as to the purpose for which the QuickBooks printouts were being offered. Initially, they told the trial court, "we want it to come in for the truth" and invoked the business records exception to the hearsay rule as the vehicle to accomplish that end. After the court expressed "grave doubts" about the applicability of that particular hearsay exception, the People changed course and claimed that the QuickBooks printouts "are not being offered for their truth" but instead were being offered for their falsity, "as circumstantial evidence that the defendant [Selivanov] knew he was lying on his tax returns." For the sake of completeness, we consider both possibilities.

To the extent the QuickBooks documents were offered to prove their falsity, we agree with the People that they were not hearsay. "A statement is not hearsay when offered to show the statement is false." (*People v. Ogg* (2013) 219 Cal.App.4th 173, 184, citing *People v. Mendoza* (1987) 192 Cal.App.3d 667, 672-673; see also *People v. Sanchez* (2016) 63 Cal.4th 665, 674 ["a hearsay statement is one in which a person makes a factual assertion out of court and the proponent seeks to rely on the statement to prove that assertion is true"].) The QuickBooks printouts accordingly were admissible for this

53

purpose so long as they were relevant and not unduly prejudicial (see Evid. Code, §§ 350-352), points defendants never contested.

To the extent the QuickBooks documents were being offered for their truth, we agree with Selivanov that they were inadmissible hearsay unless they satisfied the requirements of one of the exceptions to the hearsay rule. At trial (and now on appeal), the People argued that the business records exception was applicable. That exception is codified in Evidence Code section 1271, which provides: "Evidence of a writing made as a record of an act, condition, or event is not made inadmissible by the hearsay rule when offered to prove the act, condition, or event if: [¶] (a) The writing was made in the regular course of a business; [¶] (b) The writing was made at or near the time of the act, condition, or event; [¶] (c) The custodian or other qualified witness testifies to its identity and the mode of its preparation; and [¶] (d) The sources of information and method and time of preparation were such as to indicate its trustworthiness." The business records exception is based on the premise that records made and relied upon in the regular course of business may be regarded as trustworthy without the verification of all persons who contributed to them. (See *People v. Crosslin* (1967) 251 Cal.App.2d 968, 975 (discussing predecessor to current Evidence Code section 1271).) It eliminates the need to call each witness by simply substituting the record of the transaction instead. (*Ibid.*)

"The key to establishing the admissibility of a document made in the regular course of business is proof that the person who wrote the information or provided it had knowledge of the facts from personal observation." (*Jazayeri v. Mao* (2009) 174 Cal.App.4th 301, 322.) The witness called to present this proof "need not have been present at every transaction to establish the business records exception; he or she need only be familiar with the procedures followed." (*Ibid.*) Here, neither of the two witnesses with whom the People discussed Exhibit 105—Delos Santos and Salazar—had the requisite knowledge of AJFK's or EGeneration's accounting or recordkeeping procedures. Though these witnesses may have been knowledgeable about QuickBooks and accounting generally, they could not offer the jury any information about the "identity and the mode of . . . preparation" (Evid. Code, § 1271, subd. (c)) of the

54

particular QuickBooks documents offered as Exhibit 105. The closely analogous case of *Sierra Managed Asset Plan, LLC v. Hale* (2015) 240 Cal.App.4th Supp. 1 is instructive. There, a debt collector acquired the rights to a delinquent credit card account and sued the card holder in a limited civil collection case. (*Id.* at pp. 3-4.) The debt collector submitted as evidence a declaration by one of its employees, Mr. Roberts, which included as attachments copies of the card holder's credit card statements. (*Id.* at p. 4.) The card holder challenged the admissibility of the statements on appeal, and the Court of Appeal concluded that the trial court abused its discretion in admitting the statements under the business records exception. (See *id.* at pp. 7-9.) The court noted that Mr. Roberts had never worked at the credit card company that created the documents, was not a custodian of the documents, and lacked personal knowledge about the account and charges in question beyond what he learned upon acquiring the documents from the credit card company. (*Id.* at p. 8.) The court ruled that "Mr. Roberts's declaration and testimony at trial simply do not meet the necessary foundation" for the business records exception, because "[a]t best" all they established was that the debt collector, "as assignee from the creditor, received records originating from Citibank concerning the account in question." (*Id.* at p. 9.) Delos Santos and Salazar are no different from Mr. Roberts, the QuickBooks printouts are analogous to the credit card statements, and the business records exception is equally inapplicable in this case.

However, the AJFK/EGeneration QuickBooks printouts fit within the "authorized statements" hearsay exception codified in Evidence Code section 1222. That section provides that "Evidence of a statement offered against a party is not made inadmissible by the hearsay rule if: [¶] (a) The statement was made by a person authorized by the party to make the statement or statements for him concerning the subject matter of the statement; and [¶] (b) The evidence is offered either after admission of evidence sufficient to sustain a finding of such authority or, in the court's discretion, as to the order of proof, subject to the admission of such evidence." The People presented evidence that AJFK/EGeneration was a business owned and operated by Selivanov and Berkovich, and that Selivanov was personally involved in the day-to-day financial affairs of

55

AJFK/EGeneration. They also presented evidence that Selivanov, with assistance from Pilyavskaya, was exclusively responsible for preparing and maintaining similar QuickBooks accounts at Ivy Academia; that Pilyavskaya had nothing to do with the AJFK/EGeneration QuickBooks; that the AJFK/EGeneration QuickBooks were found on an Ivy Academia server after Selivanov denied their existence to both Atkinson and Delos Santos; that an accountant prepared EGeneration's taxes in accordance with the QuickBooks; and that the accountant had no contact with Berkovich. Collectively, this evidence was sufficient to satisfy the authorized statements exception: the jury readily could infer that Selivanov either prepared the AJFK/EGeneration QuickBooks himself or directed someone else affiliated with AJFK/EGeneration to do so. (See *O'Mary v. Mitsubishi Electronics America, Inc.* (1997) 59 Cal.App.4th 563, 570.)

Although the People did not invoke this hearsay exception below, the trial court appears to have considered it. In its ultimate ruling, the court emphasized that it was admitting the QuickBooks printouts because they bore indicia that Selivanov had a connection with the QuickBooks: he served as executive director of Ivy Academia, and the records were recovered from the school's server after Selivanov denied their existence. Whether the QuickBooks printouts were offered for their truth or falsity, we are satisfied that the trial court did not abuse its discretion in admitting them for all purposes.

### B. Sufficiency of the Evidence

Selivanov argues that the corporate tax convictions must be reversed for an additional reason: the evidence failed to establish that he "did not believe the statements made in the relevant corporate tax returns were true and correct." We disagree.

The People charged Selivanov with violating Revenue and Taxation Code section 19705, subdivision (a)(1), which criminalizes as a felony the willful making and subscribing of "any return, statement, or other document, that contains or is verified by a written declaration that it is made under penalty of perjury" that the defendant "does not believe to be true and correct as to every material matter." (Rev. & Tax. Code, § 19705, subd. (a)(1).) Selivanov contends the record contains no direct evidence that he knew or

56

believed the AJFK/EGeneration tax returns included false information, and no circumstantial evidence that he knowingly misclassified AJFK/EGeneration's expenses. He points out that his accountant and tax preparer was not called to testify, and argues that "no attempt was made to show whether Mr. Selivanov provided accurate information to his certified public accountant." He also reiterates that evidence was lacking as to the preparation and maintenance of the AJFK/EGeneration QuickBooks.

These arguments miss the mark in light of the whole record, which we view in the light most favorable to the verdict. (*People v. Clark*, *supra*, 52 Cal.4th at p. 943.) The People presented a 194-page exhibit containing checks and credit card statements that illustrated the nature of AJFK/EGeneration's expenditures and cash flow, and testimony from Salazar interpreting those documents. All of the checks were signed by Selivanov, and all of the credit card statements were addressed to him. The jury could conclude from this evidence that Selivanov was either directly involved in day-to-day financial matters at AJFK/EGeneration or had knowledge of them. The People also introduced the QuickBooks accounting records for AJFK/EGeneration, along with testimony that the entries in those books diverged from the expenditures documented in AJFK EGeneration's checks and credit card statements. As discussed above, the jury could infer from all of the circumstances that Selivanov prepared or authorized the preparation of the QuickBooks accounts, and therefore was aware that they falsely represented the nature of numerous AJFK/EGeneration transactions. Finally, the People introduced the tax returns at issue, which Selivanov signed under penalty of perjury and which aligned with the QuickBooks rather than the documentary evidence of AJFK/EGeneration's finances. The jury also learned, via stipulation, that the accountant who prepared the taxes for EGeneration, a business owned by both Selivanov and Berkovich, never had any contact with Berkovich. This evidence is substantial and supports the jury's conclusion that Selivanov knew that AJFK/EGeneration's tax returns, which tracked the AJFK/EGeneration QuickBooks stored on Ivy Academia's server, contained information that was not true and correct.

57

## IV. Personal Tax Convictions (counts 27-31)

The jury convicted Selivanov of violating Revenue and Taxation Code section 19705, subdivision (a)(1) with respect to his personal income taxes for the years 2004-2008. Selivanov contends these convictions cannot stand because they were "follow-on charges that were wholly dependent on liability for" other substantive charges, the embezzlement convictions in counts 2, 19, 22, and 25. That is, the People alleged that Selivanov failed to report as income the money he embezzled in counts 2, 19, 22, and 25. (See *People v. Hagen* (1998) 19 Cal.4th 652, 671 ["it has long been settled law that embezzled funds are taxable income"].) Selivanov argues that reversal of the embezzlement convictions also must result in reversal of the convictions for willfully filing false or fraudulent personal tax returns. This argument cannot succeed in light of our rulings above sustaining the embezzlement counts.

Selivanov makes an additional argument pertaining to count 27 only. That count alleged that Selivanov filed a false personal income tax return in 2004. There is no dispute, however, that all of the embezzlement conduct alleged and proven in counts 2, 19, 22, and 25 post-dates 2004: the American Express charges began in 2005, and the other pertinent embezzlements occurred in 2007. Selivanov accordingly contends that there is no evidence supporting his conviction for filing a false personal income tax return in 2004. In his reply brief and a footnote in his opening brief, Selivanov claims that the People failed to present evidence that he underreported income on either his personal or corporate income tax returns in 2004. Therefore, he contends, the People failed to prove any violation of Revenue and Taxation Code section 19705, subdivision (a)(1) by virtue of false statements on the 2004 EGeneration tax return "flowing through" to his personal tax return.

This argument is not persuasive. Our Supreme Court has explained that a false statement is "material" for purposes of section 19705 when it has "some objective potential for interference with the calculation or monitoring of income or tax liability." (*People v. Hagen*, *supra*, 19 Cal.4th at pp. 667-668 (emphasis omitted); see also *Stark v. Superior Court* (2011) 52 Cal.4th 368, 401.) Whether it results in the over- or

underreporting of a taxpayer's income or liabilities, a purposeful false statement on a tax return plainly carries the objective potential to interfere with the Franchise Tax Board's ability to calculate and monitor income and tax liability.

Although Selivanov is correct that the People did not present evidence that he failed to report embezzled funds as income in 2004, he overlooks their evidence that falsehoods in the form of overstated deductions on the 2004 EGeneration tax return flowed through to his personal tax return. Salazar testified that losses or gains reported on EGeneration's tax returns "passed through" or "flow[ed] over into" the personal tax returns of its members, Selivanov and Berkovich. Salazar further testified that EGeneration falsely reported $59,707 in deductions in 2004, thereby affecting its income and that of Selivanov. As discussed above, the record contained substantial evidence from which the jury could conclude that Selivanov knowingly subscribed to false information on the corporate tax returns; therefore, the jury could conclude he equally had knowledge that the same information remained false when carried through to his personal returns.

## V. Restitution

The trial court found Berkovich and Selivanov jointly and severally liable for $22,396.60 in restitution to Ivy Academia in connection with the fraudulent American Express charges, and further ordered Selivanov alone to pay an additional $205,499.48 to Ivy Academia and $43,899 to the Franchise Tax Board. Both defendants contest these orders. Berkovich contends the court abused its discretion at the restitution hearing by declining to accept and consider juror statements and declarations she submitted. Selivanov joins this argument. He also argues that he should not be jointly and severally liable for the $22,396.60 because he had nothing to do with the charges on Berkovich's American Express card, and there was no evidence that the expenses he charged could be considered an economic loss to Ivy Academia.

Selivanov raises several additional challenges to his restitution order. First, he contends that the court erred in ordering him to pay *any* restitution to Ivy Academia because Ivy Academia never made a claim of actual economic loss. Second, he contends

59

that the court erred in ordering him to pay $126,654.73 in connection with count 40 (Ivy Academia's continued loan payments to Western Commercial Bank). He argues that the loan payments Ivy Academia made did not cause it economic loss because they were deducted from the increased rent it owed to EGeneration. Finally, Selivanov contends there was no factual or rational basis underlying the court's order that he pay $43,899 in restitution to the Franchise Tax Board. We find persuasive only Selivanov's argument regarding his joint and several liability.

## A. Standard of Review

"Generally speaking, restitution awards are vested in the trial court's discretion and will be disturbed on appeal only when the appellant has shown an abuse of discretion. [Citation.] '"[E]ven though the trial court has broad discretion in making a restitution award, that discretion is not unlimited. While it is not required to make an order in keeping with the exact amount of loss, the trial court must use a rational method that could reasonably be said to make the victim whole, and may not make an order which is arbitrary or capricious."' [Citation.] '"When there is a factual and rational basis for the amount of restitution ordered by the trial court, no abuse of discretion will be found by the reviewing court."' [Citation.]" (*People v. Holmberg* (2011) 195 Cal.App.4th 1310, 1320.) "To facilitate appellate review of the trial court's restitution order, the trial court must take care to make a record of the restitution hearing, analyze the evidence presented, and make a clear statement of the calculation method used and how that method justifies the amount ordered." (*People v. Giordano* (2007) 42 Cal.4th 644, 664.)

## B. Juror Statements and Declarations

### 1. Background

In connection with her sentencing memorandum, Berkovich's counsel submitted a declaration in which she relayed the contents of post-trial conversations she had with three jurors. According to counsel's declaration, one juror reported that the jury as a whole made its own evaluation of which charges on the American Express cards were impermissible. The juror further stated that he personally found permissible the various

60

meals and teacher appreciation events and concluded that less than $1500 of the charges were disallowable. Another juror told Berkovich's counsel that the jury as a whole concluded the meals and teacher appreciation events were not criminal and that he personally thought the disallowable charges did not exceed $1500-$2000. A third juror told Berkovich's counsel that the jury as a whole agreed the restaurants and teacher appreciation events were not takings. This juror also stated that she personally concluded that clothing, diapers, and bowling were personal expenses.

Berkovich's counsel spoke with three additional jurors and attached their sworn declarations for the court. Two of those jurors stated that the jury "ultimately accepted all meals, teacher appreciation events, and gifts to teachers and students, and did not consider those items "takings" for counts one and two," while the third stated that the jury only accepted "all meals" and "most teacher appreciation events." All three of these jurors elaborated on what they personally considered to be improper personal expenses.

Berkovich's counsel referred to the juror statements and declarations at the sentencing hearing, prompting the court to state that "None of that is considered by the court. Under [Evidence Code section] 1150, you're not to consider anything that jurors say about their deliberations, so I don't know why you did that." Berkovich's counsel explained that she did not read Evidence Code section 1150 to preclude the consideration of such statements at sentencing. The court reiterated, "I don't view that as something the court should consider, their thinking and thoughts about jury deliberations; otherwise, we would have everybody doing that in every case, and they have a specific statute that says you are not supposed to do that, so I would prefer that you not address that."

Berkovich's counsel raised the issue of the juror statements and declarations at the restitution hearing several weeks later. She again urged the court to consider the statements and declarations, which she argued supported her view that Berkovich did not

61

personally benefit from many of the items charged to the American Express card and therefore should owe a lesser amount of restitution.[20]

The court declined. It explained: "First of all, I would not be inclined to accept any various affidavits filed by jurors and separate amounts of what they decided the restitution was. If courts were to go that route, I would have 12 different amounts of restitution, depending upon what the juror thought was the amount. In addition, I don't have a situation where the jurors have testified in court, they've been examined and cross-examined. I have no idea why they reached whatever conclusions they reached. And, finally, I'm absolutely convinced that 1150 prevents any consideration - - even though the court has wide latitude when it comes to restitution, I am certain that we are not supposed to take a poll of the jury and find out what they thought the amount of restitution should be. I have never seen that done. I've never heard of it being done, and it just does not seem to me to be a reasonable thing to do. I am, rather, more influenced - - and I did see and hear the evidence in this case, and I'm more influenced by the fact of the testimony of the auditors in this case who did conduct an audit and who did prepare these records, which have been submitted by the People, but which were also submitted as evidence in the case. I think this is an example of having some very strong recordations of AmEx charges and other things that were spent that were not for educational purposes; they were for the benefit of the defendants."

### 2. Analysis

Both defendants contend the court erred as a matter of law and therefore abused its discretion by citing Evidence Code section 1150 as a basis for excluding the juror statements and declarations. They argue that Evidence Code section 1150 was not applicable at their restitution hearing because they were not seeking to invalidate or attack the verdict but rather were submitting the statements and declarations "to give the

---

[20] Selivanov likewise argued that the juror statements and declarations established that he should be liable only for $367.27 in restitution on count 2, the total of the charges on his credit card for "non-business meals, non-teacher appreciation events and non-teacher gifts."

62

trial court relevant and useful information as to the jurors' perceptions of amount of loss in question." They further contend that the court's refusal to consider the juror statements and declarations deprived them of a full and fair opportunity to test the basis for the restitution order. The People recognize that "it is doubtful that the provisions of Evidence Code section 1150, prohibiting the use of juror declarations concerning their mental processes, were triggered." They argue that the court's ruling was supported by legitimate policy reasons and therefore did not constitute an abuse of discretion.

Evidence Code section 1150 provides "(a) Upon an inquiry as to the validity of any verdict, any otherwise admissible evidence may be received as to statements made, or conduct, conditions, or events occurring, either within or without the jury room, of such a character as is likely to have influenced the verdict improperly. No evidence is admissible to show the effect of such statement, conduct, condition, or event upon a juror either in influencing him to assent to or dissent from the verdict or concerning the mental processes by which it was determined. [¶] (b) Nothing in this code affects the law relating to the competence of a juror to give evidence to impeach or support a verdict." As the parties all recognize, this statute by its terms "applies only to postverdict inquiries into how error or misconduct had affected the juror in reaching the verdict." (*People v. Cooper* (1991) 53 Cal.3d 771, 838.) Because defendants were not challenging the verdict, and were not alleging juror misconduct, Evidence Code section 1150 did not prevent the court from considering the proffered juror statements and declarations.

That does not mean the court was required to consider this evidence, however. "[T]rial courts have discretion regarding the formalities they follow and the evidence they consider at such hearings." (*People v. Millard* (2009) 175 Cal.App.4th 7, 42.) Defendants fail to recognize that such discretion cuts both ways. Just because a court is permitted to consider certain evidence does not mean it is required to do so. Here, the court offered at least one valid reason for its refusal to consider the juror statements and declarations: it did not want to open the door to the bombardment of sentencing courts with up to 12 potentially conflicting juror declarations in every case involving restitution. (*Cf. People v. Arbuckle* (1978) 22 Cal.3d 749, 755 ["We cannot be oblivious to the drain

63

on time and public resources the demands of defendant would impose."].)  This was a reasonable, rational basis on which to exclude the declarations, which in this case provided varying accounts of the expenditures the jury as whole viewed as criminal.  Moreover, the divergent nature of the declarations and the inability of the court and the People to question the jurors further could have led to the consideration of unreliable or even inaccurate information, which itself would have rendered the proceedings fundamentally unfair.  (*People v. Goulart* (1990) 224 Cal.App.3d 71, 83.)

We find unpersuasive defendants' suggestion that the court's exclusion of the juror statements and declarations deprived them of "the full and fair opportunity to test the basis for the restitution order as mandated by law."  "The scope of a criminal defendant's due process rights at a hearing to determine the amount of restitution is very limited:  "'"A defendant's due process rights are protected when the probation report gives notice of the amount of restitution claimed . . ., and the defendant has an opportunity to challenge the figures in the probation report at the sentencing hearing.'"  [Citations.]"  (*People v. Cain* (2000) 82 Cal.App.4th 81, 86.)  A trial court violates these rights if the hearing procedures are fundamentally unfair.  (*Id.* at p. 87.)

The procedures the court used in this case were not fundamentally unfair.  The People submitted a sentencing memorandum requesting certain amounts of restitution, which they supported with trial exhibits.  The court afforded defendants the opportunity to submit their own sentencing and restitution memoranda and to contest the People's restitution figures in open court.  The court's reasonable refusal to consider the juror statements and declarations did not render this process unfair, particularly where the trial court presided over the five-week trial and "did see and hear the evidence in this case."  Defendants were not precluded from obtaining or submitting alternative evidence in support of their positions at the restitution hearing after they learned at the sentencing hearing that the court was disinclined to consider the juror declarations and statements.  In short, they received the process to which they were entitled.

## C.     Lack of Victim Request for Restitution

Selivanov contends that his entire restitution order as to Ivy Academia must be reversed because "Ivy Academia, the purported victim of Mr. Selivanov's conduct[,] has made no claim for victim restitution."  In his view, a victim is entitled to restitution only if he or she initiates and participates in the restitution process by identifying the type of loss sustained and its monetary value.[21]  This view is not in accordance with the law.

Article I, section 28, subdivision (b)(13)(A) of the California Constitution vests in "all persons who suffer losses as a result of criminal activity . . . the right to seek and secure restitution from the persons convicted of the crimes causing the losses they suffer."  By its very terms, this provision expresses the "unequivocal intention of the People of the State of California" (Cal. Const., art. I, § 28, subd. (b)(13)(A)) that "*every victim who suffers a loss shall have the right to restitution from those convicted of the crime giving rise to that loss*" (*People v. Phelps* (1996) 41 Cal.App.4th 946, 950 (emphasis added)).  "The only qualification is that the loss must be 'the result of criminal activity.'  [Citation.]"  (*Ibid.*)

The broad constitutional right to restitution is implemented in section 1202.4, which provides in subdivision (a)(1) that "It is the intent of the Legislature that a victim

---

[21] Selivanov asserts that "[r]epresentatives of Ivy Academia were summoned to testify in court," regarding a settlement between the board of directors and defendants, "but the trial court refused to hear them."  The court's refusal to consider such evidence was not improper.  "[T]he settlement of a civil action and release of the defendant by the crime victim does not discharge the defendant's responsibility to satisfy the restitution order:  'Even when a victim obtains a settlement from a company that insured the defendant for civil liability, the court in a criminal action may order the defendant to pay victim restitution.  This is so because the victim "might rationally chose to accept an insurance settlement for substantially less than his or her losses rather than risk the uncertain . . . possibility that the defendant will pay the entire restitution amount" [citation], and the "victim's willingness to accept the [insurance settlement] in full satisfaction for all civil liability, . . . does not reflect the willingness of the People to accept that sum in satisfaction of the defendant's rehabilitative and deterrent debt to society."'  [Citation.]"  (*People v. Vasquez* (2010) 190 Cal.App.4th 1126, 1133.)  "[A] release by the victim cannot act to release a defendant from his financial debt to the state any more than it could terminate his prison sentence."  (*People v. Bernal* (2002) 101 Cal.App.4th 155, 162.)

of crime who incurs an economic loss as a result of the commission of a crime shall receive restitution directly from a defendant convicted of that crime." Subdivision (a)(3)(B) of section 1202.4 requires the trial court to order restitution to the victim(s) of a defendant's crime "in accordance with subdivision (f)," which in turn states in pertinent part that "in every case in which a victim has suffered economic loss as a result of the defendant's conduct, the court shall require that the defendant make restitution to the victim or victims in an amount established by court order, *based on the amount of loss claimed by the victim or victims or any other showing to the court*." (§ 1202.4, subd. (f) (emphasis added).) Like the constitutional provision, these statutory provisions are devoid of any language limiting the class of compensable victims to those who affirmatively request restitution and must be broadly and liberally construed. (*People v. Mearns* (2002) 97 Cal.App.4th 493, 500-501.) Moreover, section 1202.4, subdivision (f) uses disjunctive language to indicate that the amount of restitution may be based either on the "amount of loss claimed by the victim or victims" *or* "any other showing to the court," suggesting that a claim by the victim is not, as Selivanov argues, a "primary predicate condition" for the issuance of a restitution order.

Selivanov looks primarily to *People v. Fulton* (2003) 109 Cal.App.4th 876, 885-886 to support his position. In that case, which addressed whether and to what extent attorneys' fees incurred by crime victims are recoverable as restitution, the Court of Appeal stated: "At the core of the victim restitution statutory scheme is the mandate that a victim who suffers economic loss is entitled to restitution and that the restitution is to be 'based on the amount of loss claimed by the victim.' Thus, a victim seeking restitution (or someone on his or her behalf) initiates the process by identifying the type of loss [citation] he or she has sustained and its monetary value." Selivanov reads this language to require victims to make a claim for restitution before they are entitled to receive it. We do not. The excerpt from *People v. Fulton* quotes only the first portion of the disjunctive language in section 1202.4, subdivision (f), and omits the second portion that permits the amount of restitution to be based on "any other showing to the court." We further note that the parenthetical language in the *People v. Fulton* excerpt—"or someone on his or

her behalf"—clarifies that a crime victim need not personally act on his or her own behalf. Instead, "someone," such as the People, may initiate the restitution process on behalf of a victim.

Selivanov also cites *People v. Lai* (2006) 138 Cal.App.4th 1227, 1246-1249 and *People v. Woods* (2008) 161 Cal.App.4th 1045, 1049-1053. Those cases are not on point. In *People v. Lai*, we held that "when a defendant is sentenced to state prison, section 1202.4 limits restitution to losses caused by the criminal conduct for which the defendant was convicted." (*People v. Lai*, *supra*, 138 Cal.App.4th at p. 1246.) In doing so, we discussed the constitutional and statutory rights to restitution in a manner similar to that above (see *id.* at pp. 1246-1247) and addressed the distinction between restitution orders made when a defendant is sentenced to probation and those made when a defendant is sentenced to prison (see *id.* at pp. 1247-1249). Nowhere did we state or suggest that a court may order restitution only upon receiving a claim from a victim. The same can be said for *People v. Woods*. There, the Court of Appeal considered whether a defendant convicted of being an accessory after the fact to murder lawfully could be ordered to pay victim restitution for economic losses stemming from the murder. (See *People v. Woods*, *supra*, 161 Cal.App.4th at pp. 1049-1053.) Relying heavily on *People v. Lai*, the court concluded that such a restitution order would be improper. (*Ibid.*) The court did not discuss or consider the form of the request for restitution; the case accordingly is inapposite to Selivanov's argument here.

### D.     Joint and Several Liability

#### 1.      Background

The trial court ordered defendants to pay a total of $34,445.42 in restitution in connection with count 2, embezzlement via improper use of Ivy Academia's American Express cards. The court ordered Selivanov solely responsible for the $12,048.82 in improper charges made on his card, and jointly and severally responsible for the $22,396.60 in improper charges made on Berkovich's card. In doing so, the court accepted the People's argument that Selivanov bore some responsibility for charges incurred on Berkovich's card because he exerted control over Ivy Academia's finances

67

and implicitly approved her expenditures by initiating payments on the American Express bills.

## 2. Analysis

Selivanov contends that the court erred in finding him jointly and severally liable for the charges Berkovich made because he "did not participate in the crime causing the victim's economic loss." In his view, "nothing in the record suggests that Mr. Selivanov's criminal conduct caused Ivy Academia the loss attributed to Ms. Berkovich's AMEX Card expenditures." We agree and order the judgment modified to strike the $22,396.60 joint and several obligation assessed to Selivanov.

Section 1202.4, subdivision (f) requires courts to order restitution in most cases "in which a victim has suffered economic loss as a result of the defendant's conduct." This provision contains a causality requirement: a defendant sentenced to state prison may be obligated to pay restitution only for losses stemming from the criminal conduct of which he or she was convicted. (*People v. Lai*, *supra*, 138 Cal.App.4th at pp. 1246, 1249.) A defendant may be held jointly and severally liable for losses for which a codefendant bears more culpability (*People v. Madrana* (1997) 55 Cal.App.4th 1044, 1051), but the criminal conduct of which the defendant was convicted must be at least a substantial factor in causing victim's loss (*People v. Holmberg*, *supra*, 195 Cal.App.4th at pp. 1321-1322).

The only case Selivanov cites, *People v. Leon* (2004) 124 Cal.App.4th 620, illustrates these principles. In *Leon*, two defendants wrote and cashed a total of four fraudulent checks on a victim's account while he was hospitalized. (*Leon*, *supra*, 124 Cal.App.4th at p. 622.) Defendant Leon cashed one check for $2,450, while his codefendant, Garza, cashed three checks totaling $11,000. (*Ibid.*) The trial court ordered Leon to pay $13,450 in restitution jointly and severally with Garza, and the Court of Appeal reversed. (*Ibid.*) The Court of Appeal held that the trial court lacked authority under section 1202.4 to order Leon to pay restitution for a crime he did not commit. It reasoned that because "$11,000 of [the victim's] loss resulted from the crimes of Garza, not Leon, and nothing in the record suggests that Leon aided and abetted commission of

68

Garza's crimes," Leon could be liable only for the $2,450 of losses attributable to the check he cashed. (*Ibid.*)

The same is true of the losses attributable to the credit card charges in this case. The People presented evidence that $22,396.60 of the $34,445.42 in fraudulent charges were made to a card issued to Berkovich, and that $12,048.82 of the charges were made to a card issued to Selivanov. The criminal conduct at issue was defendants' use of the cards to make charges unrelated to the educational purpose of Ivy Academia, or, as the information put it, "credit card charges made to Ivy Academia's American Express account." The People distinguished between defendants' usage of the cards and did not present any evidence that Selivanov made the charges on Berkovich's card or that he assisted her in doing so. Like the defendants in *Leon* who separately wrote and cashed fraudulent checks on the same account, Selivanov and Berkovich independently used their Ivy Academia credit cards for nefarious purposes.

The People contend that "Selivanov had control of the finances and instituted payment for the improper charges," and "tried to hide the charges." That conduct was not the basis of Selivanov's conviction on count 2, however, which rested upon the actual "credit card charges made to Ivy Academia's American Express account." The People do not point to any evidence that Selivanov directed, aided, or endorsed Berkovich's fraudulent use of her card, or that Selivanov was even aware of many of the improper charges Berkovich made, such as those for personal items. Nor have they pointed to any evidence from which the trial court could have concluded that the charges on Selivanov's card were a substantial factor that contributed to the charges on Berkovich's card. We accordingly conclude the court abused its discretion by holding Selivanov jointly and severally liable for the charges made to Berkovich's card. The trial court is directed to modify both defendants' restitution orders to reflect that Berkovich alone is liable for the $22,396.60 in restitution to Ivy Academia associated with count 2.

### E.     Economic Loss to Ivy Academia

Selivanov contends that the portions of the restitution order directing him to pay Ivy Academia $126,654.73 on count 40 (embezzlement in connection with Ivy

69

Academia's continued payment of the Western Commercial Bank loan) and $12,048.82 on count 2 (embezzlement with the American Express card) are unsupported by evidence that Ivy Academia sustained economic loss. He argues that the loan payments were "fully deducted from Ivy Academia's lease payment for its use of the De Soto facility" and therefore caused no loss to the school, and that the teacher appreciation events and business meals he charged on the American Express card "were a benefit" to Ivy Academia. We find these contentions unpersuasive.

At a restitution hearing, the People carry the initial burden of demonstrating the amount of the victim's economic loss. (*People v. Sy* (2014) 223 Cal.App.4th 44, 63; *People v. Fulton*, *supra*, 109 Cal.App.4th at p. 886.) Their showing establishes the amount of restitution the victim is entitled to receive, and the burden shifts to the defendant to prove by a preponderance of the evidence that the loss is other than that claimed. (*People v. Sy*, *supra*, 223 Cal.App.4th at p. 63; *People v. Tabb* (2009) 170 Cal.App.4th 1142, 1153.) The People carried their initial burden as to both the loan payments and the credit card charges by presenting the court with evidence of Ivy Academia's outlays.

Selivanov did not present evidence (aside from Berkovich's juror statements and declarations) to refute this showing. Instead, he argued that the continued loan payments at worst constituted a "phantom loss" or "paper loss" because Ivy Academia "continued to pay on a loan from which it was benefiting, because what the loan paid for were building improvements the school was still enjoying," and that the credit card losses should be limited to $367.27, the amount Selivanov charged on "non-business meals, non-teacher appreciation events and non-teacher gifts." The trial court did not abuse its discretion in rejecting these arguments, which it noted the jury also rejected. With respect to the loan, the trial court stated "it was clear, at least it was clear to me, that what Mr. Selivanov did in a very sophisticated manner is he had Ivy Academia pay off loans that they were not required to pay off, and as a result of paying off those loans, he benefited. So that is the amount on that." And with respect to the challenged credit card charges, the court concluded that none of them was made for a proper educational

70

purpose. Rather, all were for defendants' benefit. The court's conclusions rest upon strong factual and rational bases, and we do not disturb them.

### F. Restitution to Franchise Tax Board

#### 1. Background

The court ordered Selivanov to pay a total of $43,899 in restitution to the Franchise Tax Board. That total was the sum of three distinct figures: (1) $28,251, the Franchise Tax Board's costs of investigation and prosecution; (2) $14,226, the total of the additional personal income taxes owed ($5,450 for 2004, $656 for 2005, $2,122 for 2006, $4,392 for 2007, and $1,605 for 2008)[22]; and (3) $1,422, representing 10 percent interest on the back taxes. Selivanov argued at the restitution hearing that, at most, he should be liable for the agency's investigative and prosecution costs, the amount of which he did not dispute. He also argued that there was no evidence in the record to support the amount of back taxes and interest due, because the Franchise Tax Board did not conduct a civil tax audit, and the numbers it presented accordingly were "inherently unreliable." The court rejected these arguments on the grounds that evidence to support the tax liabilities "came out in the trial."

#### 2. Analysis

Selivanov contends the "trial court simply accepted the Franchise Tax Board's assertion that such was the tax liability without question or concern," despite his demonstration of "significant deficiencies" in the numbers. The "deficiencies" he points out are: (1) the tax liability was calculated based on the purported unreported income of both defendants; (2) during trial, Franchise Tax Board agent Salazar "admitted that $28,698 out of the claimed unreported income for 2007 was, in fact, reported"; and (3) the People simply accepted Salazar's disallowance of all EGeneration deductions that were misclassified or inflated rather than performing an analysis "to ascertain whether the misclassified expenses could have been deducted under a different category, or what was

---

[22] These numbers add up to $14,225. Selivanov has not challenged this arithmetic error.

71

the overall tax impact of the misclassifications." We are not persuaded that these putative deficiencies render the numbers found by the court lacking in factual basis.

All of the personal tax returns in this case were filed jointly and signed by Selivanov. We see no basis from which to conclude that Berkovich's lack of convictions on the tax counts reduces the amount of taxes for which Selivanov is liable on the parties' joint returns. Moreover, although Selivanov asserts that "Ms. Berkovich's supposedly unreported income should be removed from the calculation," he fails to provide even an estimate of what that income was, or what its impact on the tax liability would have been. Mere suggestion of error is insufficient to undermine the People's prima facie showing of the restitution amount, or to demonstrate that the trial court's order lacked a factual basis.

The same is true of Selivanov's other contentions. If Selivanov disagreed with Salazar's testimony regarding reported income in 2007 or believed the calculations the People proffered at the restitution hearing did not reflect deductions that properly could have been taken, he could have undertaken the analysis himself to provide a basis for the court to find a lower number. He did not do so in the trial court and has not done so on appeal. The restitution amounts ordered by the court were supported by the record, and we will not overturn them on the showing here.

## VI. Grant of Motions for New Trial

### A. Background

Count 1 of the information alleged that Selivanov and Berkovich misappropriated public funds by making improper charges to their Ivy Academia American Express cards. (§ 424, subd. (a)(1).)[23] Count 39 alleged that both defendants misappropriated public funds by using Ivy Academia funds to make payments on the Western Commercial Bank

_____

[23] In pertinent part, section 424, subdivision (a) prohibits "[e]ach officer of this state, or of any county, city, town, or district in this state, and every other person charged with the receipt, safekeeping, transfer, or disbursement of public moneys" from misappropriating, misusing, improperly accounting for, or improperly disposing of public moneys. (§ 424, subd. (a); see also 2 Witkin & Epstein, Cal. Crim. Law 4th (2012) Crimes Against Property, § 44, p. 69.) Counts 1, 7, 11, 18, 21, 24, and 39 alleged violations of section 424, subdivision (a).

loan after EGeneration assumed liability for it.  (§ 424, subd. (a)(1).)  Count 7 also pertained to both defendants and alleged that they improperly profited from public moneys by virtue of the rent increase.  (§ 424, subd. (a)(2).)  The remaining counts (11, 18, 21, and 24) applied only to Selivanov and alleged that he falsely accounted for public moneys in the Ivy Academia financial records (§ 424, subd. (a)(3), count 11) and misappropriated public moneys by transferring funds from Ivy Academia to EGeneration when the latter was not owed money (§ 424, subd. (a)(1), counts 18, 21, 24).

## 1.    Section 424 Jury Instructions

The court instructed the jury on the section 424 counts using modified versions of CALJIC Nos. 7.26.1, 7.26.2, and 7.26.3.  The court's modified CALJIC No. 7.26.1 stated in pertinent part:  "Defendant Selivanov is accused in Counts [1, 18, 21, 24, and 39] and Defendant Berkovich is accused in Counts 1 and [39] of misappropriation of Public Funds by a Public Official in violation of section 424, subdivision (a)(1) of the Penal Code, a crime.  [¶]  Every officer of this state, or of any county, city, town, or district of this state, and every other person charged with the receipt, safekeeping, transfer, or disbursement of public moneys, who without authority of law, appropriates the same or any portion thereof, to his or her own use, or to the use of another, is guilty of a violation of Penal Code section 424, subdivision (a)(1), a crime.  [¶]  The phrase, "public moneys" as used in this instruction, includes all monies and evidences of indebtedness received or held by Ivy Academia Charter public school or its officers in their official capacity.  [¶] The term "Officer" as used in this instruction includes a charter school operator, administrator, executive director and President.  [¶]  The term "district" as used in this instruction includes a charter school."

The modified version of CALJIC No. 7.26.2, which pertained to count 7, stated that "The phrase, "public moneys" as used in this instruction, includes all moneys and evidence of indebtedness received or held by Ivy Academia Charter public school or its officers in their official capacity."  The modified version of CALJIC No. 7.26.3, which pertained to count 11 and defendant Selivanov only, stated, "The phrase, "public

73

moneys" as used in this instruction has previously been defined in these instructions." There is no indication in the record that defendants objected to these instructions.

The jury found defendant Selivanov guilty of all seven of the section 424, subdivision (a) counts with which he was charged. The jury found Berkovich guilty of misappropriating public funds as alleged in counts 1 and 39 but acquitted her of profiting from the rent increase as alleged in count 7.

## 2. Motions For New Trial

In Selivanov's motion for new trial, which Berkovich joined, he contended these instructions were improper for two reasons. First, he argued that "by defining the statutory terms "public moneys," "district," and "officer" in the manner it did, the Court relieved the prosecution of the burden of proving, beyond a reasonable doubt, that Mr. Selivanov was indeed a public officer, or that he was in charge of public moneys." Second, Selivanov contended that the definitions the court provided for "public moneys," "district," and "officer" were incorrect because independent charter schools operated by nonprofit organizations are not "counties, cities, towns, or districts in the state of California" and their funds are not "moneys belonging to a county, city, town, district or public agency therein, or held by an officer of those governmental entities, and therefore are not "public moneys" under Penal Code § 426."[24]

The court held a lengthy hearing on the new trial motions at which it told the parties that the issue it was "most interested in listening to, is the issue on the 424 and the issue about misinstruction and that line of cases that say, in essence, that you can't take away from the jury one of the elements of the crime. There's a whole line of cases that have been cited for that. There are others. That is one of my biggest issues that I want to hear argument on." The court further clarified the issue: "Didn't I instruct or tell the jury, basically, that the monies received by the Ivy Academia school were, in fact, public

_____

[24] Section 426 states: "The phrase 'public moneys,' as used in Sections 424 and 425, includes all bonds and evidence of indebtedness, and all moneys belonging to the state, or any city, county, town, district, or public agency therein and all moneys, bonds, and evidences of indebtedness received or held by state, county, district, city, town, or public agency officers in their official capacity."

74

monies?  And doesn't the instruction in that area lay out that they are supposed to decide whether those are public monies or not?  Didn't I direct them that any money received, any indebtedness for this school is public money?"  After some argument by the parties, the court again clarified its thinking:  "I'm less troubled by "officer."  I'm more troubled, frankly, by public monies, because there is an actual instruction under 726.1 [*sic*]. I didn't use that instruction.  I think one of the reasons I didn't use it is I'm, in some ways, agreeing with the People that I thought, as a matter of law, this was public monies.  I believe that was my mindset, that it's not really that big of an issue for the jury.  It's public monies.  It came from the state; it went to this charter public school:  it's public monies.  So I didn't really foreshadow this issue.  But now that the issue has been brought to my attention, I certainly see it as an issue, whether the definition that should have been given to the jury should have been more something that they could choose from rather than simply saying that monies received by a charter school are public monies."

The court ultimately "decided, after thinking about it for endless hours," that a new trial was required on all of the section 424 counts.  The court explained:  "The Constitution gives a criminal defendant the right to have a jury determine beyond a reasonable doubt his guilt of every element of the crime with which he is charged.  The trial court may not direct a verdict of guilt no matter how conclusive the evidence, and I don't believe I can take judicial - - not judicial notice, but find as a matter of law - - I believe that the issue of public monies is an element of the crime; you have to prove it.  And I guess what I ultimately believe is that by instructing the way I did, that I took that element away from the jury.  . . .  If this had just been tweaked a little bit and we had thrown in charter school, or charter school is considered a public agency, or something like that, I believe there would be no problem.  But in reading the cases, I just feel that the instruction told them:  you have to find this as public monies, because what I told them was that monies received by the charter school were public monies, and I don't believe that I could do that."  The court continued, "I will also indicate, just parenthetically, that I have no problem with 424 applying to charter schools.  I don't

75

think that is a valid argument.  I reject that argument.  The only reason I'm reversing is strictly on jury instructional error."

The prosecutor asked, "Your honor, is that only as to public money, the statement on public money?"  The court confirmed that it was.  "Right.  That was the only thing."  Later, the court reiterated that "[t]he issue is whether or not the jury made an independent decision of finding that it was public money, because it's an element of the crime."  It further stated "I think there is an issue about whether the jury was directed to find, as a matter of law, that the money that flowed to the charter school was public money.  I know as a reality it's public money and  - - but the next issue is: can I, as a judge, order them to find that it's public money?  And I don't think I can.  That is what I'm holding.  That's my decision."

The People timely filed a notice of appeal pursuant to section 1238, subdivision (a)(3).

## B.     Discussion

In their opening brief, the People present a single issue for our consideration: "When charter schools are operated by non-profit organizations do they become immune from liability for purposes of section 424 and 426 as a matter of law because they are not "districts" within the meaning of the statutes?"  They spend the entirety of their opening brief addressing this issue despite the trial court's explicit rejection of the defense argument to that effect.

For instance, the People's lead argument is that *People v. Holtzendorff* (1960) 177 Cal.App.2d 788, which Selivanov (and Berkovich, though adoption) relied upon below to support the contention that Ivy Academia was not a "district" or "public agency," "is not instructive on the question of whether a charter school is a district within the meaning of sections 424 and 426."  The People assert that "the trial court clearly adopted" the defense argument that "private non-profit charter schools were *immune* from the statute because the legislature had expressly failed to name them within section 424."  They claim this was error:  "the court, relying upon the defense's representation that *Holtzendorff* was the only, and leading, authority on the issue, erred as a matter of law in

76

granting a new trial as to the section 424 counts on that basis." The People further contend that the court instead should have followed *People v. Johnson* (2012) 209 Cal.App.4th 800, which in their view "provides clear authority for criminal liability ***as a matter of law*** based upon the exhibition of state supervision and regulatory control."

In response to these arguments, Selivanov (and Berkovich, through adoption) contends that "the People do not address the jury instruction upon which the trial court based its new trial order." He also points us to the trial court's explanations of its rulings (see *ante,* at p. 76), which indeed make clear that the trial court granted the motion for new trial solely on the ground that it took the element of "public moneys" away from jury. Selivanov urges us to affirm the trial court's ruling on this basis. Although he contends that "[r]ight or wrong on the issue of whether charter schools are legally districts, that issue does not impact the trial court's new trial order, and thus should not be considered by this Court on review of that order," Selivanov devotes the remainder of his brief to opposing the People's arguments, "[i]n the event this Court wishes to consider the People's irrelevant issue."

In their reply brief, the People acknowledge that "[t]he trial court's order only referenced the jury instruction issue," and that "[t]he court granted a new trial because it believed the jury, not the court, needed to decide whether funds belonging to Ivy Academia were 'public moneys' under Penal Code sections 424 and 426." They then contend for their first time in their reply brief "that this was legally erroneous (i.e., the original instruction was correct) because all funds belonging to charter schools are, by definition, 'public moneys,' and Ivy Academia was a charter school." They also assert for the first time, initially in a footnote and then in the final three paragraphs of their reply brief, that the trial court "also misstated the harmless error standard."

The People have forfeited both of these belatedly raised arguments. "Withholding a point until the reply brief deprives the respondent of an opportunity to answer it . . . . Hence, a point raised for the first time therein is deemed waived and will not be considered, unless good reason is shown for failure to present it before." (*People v. Baniqued* (2000) 85 Cal.App.4th 13, 29; see also *People v. Tully, supra,* 54 Cal.4th at

77

p., 1075 ["It is axiomatic that arguments made for the first time in a reply brief will not be entertained because of the unfairness to the other party."].) Here, the People indicate that they "may have overlooked" these crucial issues in their opening brief because they "assumed that the court's eventual new-trial grant agreed" with the primary arguments set forth in defendants' written submissions rather than those the court discussed and actually ruled on at the hearing on the new trial motions. While we appreciate the People's candor, particularly their acknowledgements that Selivanov's "points regarding the framing of the issues . . . are well taken," their faulty assumptions regarding the substance of the trial court's ruling do not in our view constitute good reason for their failure to address the pertinent issue in their opening brief. Moreover, we are not of the opinion that justice requires us to reach the issue. (See *People v. Masotti* (2008) 163 Cal.App.4th 504, 508; *People v. Norwood* (1972) 26 Cal.App.3d 148, 152.) The court's ruling was not an acquittal; the People may retry defendants on the challenged counts if they wish.

We thus turn to the arguments the People made in their opening brief, which do not address the basis for the court's ruling or argue why that basis is legally incorrect. Although an "order granting new trial will be affirmed on appeal without regard to the particular reason given if there is a good and sufficient reason present which is within the terms of the motion" (*People v. Montgomery* (1976) 61 Cal.App.3d 718, 728), such an order will not be reversed unless the appellant affirmatively demonstrates—by making proper argument in its opening brief—that the ruling is erroneous. "The very settled rule of appellate review is a trial court's order/judgment is presumed to be correct, error is never presumed, and the appealing party must affirmatively demonstrate error on the face of the record." (*People v. Davis* (1996) 50 Cal.App.4th 168, 172.) The People have not made that demonstration here. Even if the argument they present in their opening brief is correct – that charter schools are by definition "districts" for purposes of sections 424 and 426 – they have not properly contested the court's instruction regarding public moneys. We accordingly affirm the trial court's decision to grant defendants' new trial motions.

## DISPOSITION

The trial court is directed to modify defendants' restitution orders as follows: The restitution Selivanov owes to Ivy Academia must be reduced to $205,499.48, for which Selivanov is solely liable. Berkovich's order must be modified to strike any language making Selivanov jointly and severally liable for her $22,396.60 restitution to Ivy Academia. The trial court further is directed to forward copies of the amended restitution orders to the California Department of Corrections and Rehabilitation. The judgment of the trial court is otherwise affirmed in full.

## CERTIFIED FOR PUBLICATION

COLLINS, J.

We concur:

EPSTEIN, P. J.

MANELLA, J.

79